(No. 75556.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CORTEZ BROWN, Appellant.

*Opinion filed January 18, 1996.*

134

HARRISON, J., took no part.

Roger W. Wenthe and Judith A. Kelley, of McDermott, Will & Emery, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee

138

G. Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion the court:

Following a bench trial in the circuit court of Cook County, the defendant, Cortez Brown, was convicted of one count of murder. The defendant's death sentencing hearing proceeded before the trial judge sitting without a jury. The trial judge found the defendant eligible for the death penalty (720 ILCS 5/9—1(b)(3), (b)(11) (West 1994)), and further found that there were no mitigating factors sufficient to preclude imposition of a death sentence. The defendant's sentence has been stayed pending his direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).

## FACTS

The defendant's conviction in this case arose out of the shooting death of Curtis Sims on June 8, 1990, at 5313 South Bishop in Chicago. Christopher Posey testified at trial that he was sitting on the porch at that address with Sims at the time the shooting occurred. Posey stated that he heard shots being fired, saw two persons firing weapons, and ran upstairs into the building.

Officer James Williamson and Officer Robert Trlak were on uniform patrol in the early morning hours of June 8, 1990. At 2:40 a.m., the two officers came upon a gray Ford in their patrol area. While the officers were talking to the driver, they heard gunfire. Officer Williamson testified that he heard quite a few shots, fired from two distinct weapons. The officers told the driver of the gray Ford to leave the area and proceeded in their squad car toward the location of the gunfire. As they were doing so, the officers saw two black males running toward them in an alley. Both of the officers testified

that the shorter of the two men, running in back of the other, was carrying a large black gun, and the taller man was carrying a smaller handgun. The officers were pursuing the men when they saw the same gray Ford they had seen before pull up, and the shorter of the two fleeing men jump into it. The officers pursued the car until, with the car still moving, the two occupants jumped out and ran. Each of the officers chased one of the occupants on foot, but they were unable to apprehend them.

On June 9, 1990, Officers Williamson and Trlak each viewed a lineup and identified Dwayne Macklin as the taller man they had seen running in the alley, and identified Willie Walker as the driver of the gray Ford. On September 21, 1990, Officers Williamson and Trlak each viewed another lineup and identified the defendant as the man running in the alley carrying the large black gun. Both of the officers also examined one of the State's exhibits, a large black .45-caliber Uzi, and stated that it resembled the weapon carried by the shorter man in the alley.

The crime scene revealed shell casings from a .45-caliber weapon and from a 9-millimeter weapon, along with one fired bullet. The autopsy of Curtis Sims' body disclosed that he sustained three gunshot wounds to his back, buttocks and leg. The bullets remained in two of the wounds, but had left the body in the third wound. One .45-caliber bullet and one 9-millimeter bullet were recovered from Sims' body. The pathologist testified that Sims died as a result of the gunshot wounds. The pathologist could not say which of the three wounds caused Sims' death, but agreed that "any three of them" could have killed him.

Following the arrest of Macklin soon after the murder, Macklin gave Chicago Detective Michael Kill information about the location of some weapons. As a result,

Detective Kill recovered a 9-millimeter handgun. A firearms expert testified that a 9-millimeter cartridge case recovered from the Sims murder scene was fired from this gun. The police also recovered a .45-caliber Uzi at 5933 South Union in Chicago, as a result of information gained from a suspect arrested in another case. A firearms expert testified that the fired .45-caliber bullets from the Sims murder had the same class characteristics as those he test fired from the recovered Uzi.

On September 20, 1990, the defendant was arrested by police in Park Forest, Illinois, after he jumped out of a moving stolen vehicle. When it was learned that there was a warrant outstanding for the defendant's arrest in Chicago, the defendant was turned over to the Chicago police department. The defendant gave Chicago police an oral and a court-reported statement regarding the Sims shooting. Both of the defendant's statements were admitted into evidence. In his statements, the defendant relayed the following about the shooting of Curtis Sims.

At approximately 12 a.m. on June 8, 1990, the defendant was standing with Willie Walker near the corner of 59th Street and Union Avenue in Chicago. The two men were approached by Dwayne Macklin. Both Macklin and the defendant were members of the Gangster Disciples street gang. Macklin told the defendant and Walker that some members of a rival gang, the Vice Lords, had been bothering Macklin when he went to visit his girlfriend. Macklin asked whether defendant and Walker wanted to "go over to 53rd and Bishop to see some Vice Lords." The defendant understood Macklin's suggestion to mean that he wanted to go there to shoot some Vice Lords. The defendant agreed to go with Macklin.

Macklin thereafter rented a car to take the three men to their destination. Walker drove the car. Both the defendant and Macklin carried guns. According to

the defendant, Macklin carried a .45-caliber Uzi and the defendant carried a .25-caliber semiautomatic weapon. Walker drove the car to the corner of 53rd and Bishop and dropped off the defendant and Macklin. The defendant and Macklin then walked a short distance to 5313 South Bishop, where two men were sitting on the porch. According to the defendant, Macklin said "what's up" to the men and started shooting at them with the Uzi. The defendant stated that Macklin fired between 9 and 13 shots and that the defendant stood next to him during the shooting "watching his back." Both the defendant and Macklin then fled the scene.

Also following his arrest on September 20, 1990, the defendant was questioned regarding the murder of Delvin Boelter. The defendant gave a statement regarding the Boelter murder at that time. Because there is some interplay between this case and the Boelter case, we briefly discuss the Boelter murder.

Delvin Boelter, a member of another rival gang, the Black Disciples, was shot to death in an alley on September 16, 1990. Four men, including the defendant, were charged with Boelter's murder. One man pled guilty to murder and one man was tried and acquitted of the murder. The defendant was tried, jointly with the fourth man, at a jury trial presided over by the same trial judge who conducted the trial in this case. The defendant and his codefendant were both found guilty of Boelter's murder. The conviction against the defendant was based upon an accountability theory, as it was not alleged that the defendant actually shot Boelter. While this appeal has been pending, the defendant's conviction for the Boelter murder was reversed by the appellate court, and the cause was remanded for a new trial (No. 1—92—2732 (unpublished order under Supreme Court Rule 23)).

In the instant case, the defendant was found guilty,

after a bench trial, of one count of murder. Prior to trial, the defendant signed a jury waiver for sentencing. The trial judge found the defendant eligible for the death penalty, and thereafter heard evidence in aggravation and mitigation. The trial judge found that there were no mitigating factors sufficient to preclude the death penalty and, accordingly, sentenced the defendant to death.

## ANALYSIS

The defendant raises several challenges to the propriety of his murder conviction and death sentence. With regard to his conviction, the defendant contends that reversal is warranted because: (1) his inculpatory statements to police regarding the shooting were involuntary, and (2) the evidence was insufficient to prove beyond a reasonable doubt that he caused Sims' death. With regard to his death sentence, the defendant also asserts several challenges; however, due to our disposition of this case, we address only the following contentions: (1) that the defendant's waiver of a jury for sentencing was invalid; (2) that his eligibility for the death penalty was not sufficiently proven; and (3) that the Illinois death penalty statute is unconstitutional. For the reasons stated below, we affirm the defendant's murder conviction but vacate the defendant's death sentence and remand for a new death sentencing hearing.

## I

### Trial Issues

*Voluntariness of Defendant's Statements*

The defendant asserts that his oral and written statements to police inculpating himself in the Sims shooting were involuntary and were therefore improperly admitted at his trial. We disagree.

The State first urges us to find that the defendant has waived this issue because he did not, prior to the commencement of his trial for the Sims murder, move to have his statements suppressed. As the State points out, prior to the Boelter murder trial, all of the defendants, including this defendant, filed motions to suppress their statements. The trial judge denied the defendant's motion to suppress. The State submits that, because the defendant did not renew his motion to suppress prior to or during the Sims murder trial, the defendant has waived the issue in this case. We decline to find waiver here. It appears that the pretrial litigation of both the Sims murder case and the Boelter murder case proceeded simultaneously, and the defendant's motion to suppress covered his statements regarding both murders. The captions of the reports of proceedings of the lengthy suppression hearing refer to either the indictment numbers for both the Sims case and the Boelter case or the number for the Sims case only. Moreover, the testimony at the suppression hearing clearly encompassed the circumstances surrounding the defendant's statements about the Sims murder. This is logical, considering that the defendant's statements in each of the cases were apparently given during the same period of custody, following his arrest in September 1990. In light of the foregoing, we find that the defendant's motion to suppress adequately preserved the voluntariness issue for review in this case. Turning to the merits of the issue, however, we conclude that the defendant's statements were properly admitted.

The defendant asserts two challenges to the admission of his inculpatory statements. First, the defendant contends that the statements were the result of threats and coercion and were therefore involuntary. Second, the defendant contends that the statements were obtained pursuant to questioning by police following the defendant's assertion of his right to counsel.

We first analyze the defendant's claim that his statements were the result of a coercive environment. In determining whether a defendant's inculpatory statement was voluntarily made, this court must look at the totality of the circumstances surrounding the making of the statement. (*People v. Melock* (1992), 149 Ill. 2d 423, 447; *People v. Terrell* (1989), 132 Ill. 2d 178, 198.) Voluntariness turns on several factors, including "the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment." (*People v. House* (1990), 141 Ill. 2d 323, 376.) The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession. *House*, 141 Ill. 2d at 376; *Terrell*, 132 Ill. 2d at 198.

The issue of whether a confession was voluntary is a matter for the trial court alone to decide, and the trial judge's ruling will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*People v. Ramey* (1992), 152 Ill. 2d 41, 57; *House*, 141 Ill. 2d at 376.) The trial court here held an extensive evidentiary hearing on the defendant's motion to suppress, at which the defendant and numerous law enforcement officers testified. After hearing all the evidence, the trial judge ruled that the defendant's statements were voluntary and admissible. We conclude that the trial judge's ruling was not against the manifest weight of the evidence.

The following testimony pertaining to the circumstances surrounding the defendant's confessions was presented at the suppression hearing. The defendant was arrested by Park Forest police at approximately 10:30 p.m. on September 20, 1990, after he was observed

in a stolen vehicle. Upon his arrest, the defendant gave Park Forest police a fictitious name, and told them that he was 15 years old, when in fact he was 20 years old at that time. The defendant was kept overnight in a cell while his fingerprints were sent for verification of his identity. According to the Park Forest police officers, the defendant was housed alone in the cell because he was believed to be a juvenile. It was subsequently discovered that a warrant for the defendant's arrest was outstanding in Chicago, and the Chicago police were notified. Chicago police officers took custody of the defendant early the next morning. It is undisputed that, while he was in the custody of Park Forest police, the defendant underwent no police questioning. Rather, the defendant spent the night sleeping in his cell.

Upon his transfer to Chicago police custody, the defendant was taken to Area One Police Headquarters, where he was questioned by two detectives and one assistant State's Attorney in connection with an armed robbery case. The defendant testified at the suppression hearing that while he was at Area One, he called his mother and asked her to obtain an attorney for him, and that he told his interrogators that he wanted his attorney present. Each of the two detectives and the assistant State's Attorney who questioned the defendant at Area One testified that the defendant never asked for a lawyer or asked to wait for a lawyer, although he was advised of his *Miranda* rights prior to questioning.

The defendant was transported to Area Three Police Headquarters late in the morning on September 21, 1990. At Area Three, the defendant was questioned by Detectives John O'Brien, John Paladino and Tony Maslanka, regarding both the Sims and the Boelter murders. Prior to making his inculpatory statement, the defendant was interrogated twice by the detectives. The first interrogation began at approximately 5:30 p.m.

and lasted about 15 minutes. The second interrogation began at approximately 6:30 p.m. and lasted about 30 to 45 minutes. The defendant was advised of his *Miranda* rights prior to each interrogation. It was during the second interrogation that the defendant made his first inculpatory statement regarding the Sims murder.

The defendant testified at the suppression hearing that he told the detectives at Area Three that he was waiting for a lawyer. All three of the detectives testified that the defendant never stated that he was waiting for a lawyer. The defendant also testified that the detectives at Area Three threatened him that he would receive the death penalty if he did not cooperate, and that two detectives struck him repeatedly on the chest, hands and legs until he agreed to make a statement. Detectives Paladino, O'Brien and Maslanka each testified that they did not threaten or coerce the defendant in any way, and that they never struck the defendant, nor did they observe anyone else strike the defendant.

After the second interrogation, the defendant appeared in a lineup, which was viewed by Officers Williamson and Trlak. The defendant was permitted to use the bathroom after the lineup, and, a while later, food and soft drinks were provided to the defendant. After the lineup, Detective Paladino had another conversation with the defendant regarding the Sims murder, at which Assistant State's Attorney David Studenroth was present. The defendant was again advised of his *Miranda* rights. Assistant State's Attorney Studenroth testified that he asked the defendant how the police had treated him and that the defendant responded that he had been treated fine and that no one had struck or threatened him. Following this conversation, a court reporter was obtained and the defendant gave a court-reported statement regarding the Sims murder. The defendant acknowledged his signature on the court-reported statement.

During his testimony at the suppression hearing, the defendant admitted that he was examined by a paramedic upon his admission to Cook County jail on September 22, 1990, and that he complained of no injuries to the paramedic and that the paramedic's report indicated that he was in good health. The defendant testified that the reason he made no complaints about the detectives' treatment to either the assistant State's Attorney or the paramedic was that he feared additional police beatings.

Considering all appropriate factors, we find that there was ample evidentiary support for the trial judge's conclusion that the defendant's will was not overborne when he made his inculpatory statements. The defendant was 20 years old and had previous experience with the criminal justice system at the time of his confession. The defendant possessed the mental capability to pass, while in jail, the GED test to obtain his high school degree. The defendant does not dispute that he was advised of his *Miranda* rights prior to making his statements. With regard to whether the defendant was subjected to physical mistreatment, the evidence on that question was conflicting. While the defendant claimed that he was subjected, at Area Three, to threats and physical coercion, that claim was directly contradicted by all three of the detectives and the assistant State's Attorney who questioned the defendant. The defendant's claim of physical abuse was further undercut by the paramedic's report indicating that, on September 22, 1990, the defendant had no health complaints and bore no signs of physical injury. Also, in his court-reported statement, the defendant expressly stated that he had no complaints about the treatment he had received from the police. It was up to the trial judge to resolve the conflicts in the testimony by making a credibility determination. (*People v. Ramey* (1992), 152 Ill. 2d 41, 58.) We

cannot say that the trial judge's decision to disbelieve the defendant's allegations of mistreatment was against the manifest weight of the evidence. *People v. Smith* (1992), 152 Ill. 2d 229, 254-55.

Neither do the length and circumstances of the defendant's detention support the conclusion that his will was overborne. It is true, as the defendant points out, that he was arrested at around 10:30 p.m. on September 20, 1990, and that he did not give his first statement in this case until late afternoon on September 21, 1990. Given the attendant circumstances, however, we cannot find that this duration of custody evidences coercion. The defendant was not held at one location and questioned regarding one crime for 19 hours. Rather, the defendant was arrested, by suburban police, for a crime apparently unrelated to the Sims murder, and was held overnight, in a cell with a bed, while his identity was verified. It can certainly be presumed that the length of the defendant's stay in the Park Forest police station was affected, at least in part, by the fact that the defendant gave Park Forest police a false name and age. Moreover, the defendant was not subjected to any interrogation while in the custody of Park Forest police but, in fact, spent the night sleeping.

The remainder of the time period leading up to the defendant's confession does not suggest coercion either. Time was spent transporting the defendant to Area One Police Headquarters, where he was questioned regarding yet another apparently unrelated crime, and then transporting him to Area Three. The defendant was not interrogated regarding the Sims murder until he arrived at Area Three. The defendant was at Area Three for approximately six hours prior to giving his first statement. However, it appears that the defendant was subjected to only two interrogations regarding that crime, each of short duration, before he made his state-

ment. Moreover, a detention of six hours does not appear to have been excessive, given that two murders, involving multiple suspects, were being investigated during this time. Further, the defendant was provided food and drink, allowed to use the bathroom, and had the opportunity to use the telephone. The defendant does not contend that he ever requested food, bathroom facilities or the use of a telephone and was denied them. In light of the foregoing, we reject the defendant's contention that the length and circumstances of his detention demonstrate that his statements were the result of an overborne will. (See *House*, 141 Ill. 2d at 379-80; *In re Lamb* (1975), 61 Ill. 2d 383, 388-89.) Having taken into account all the appropriate factors, we find that the trial judge's ruling was not against the manifest weight of the evidence.

We now turn to the defendant's contention that his statement was inadmissible because it was obtained as a result of questioning that occurred after his assertion of his right to counsel. The fifth and fourteenth amendments to the United States Constitution guarantee an accused the right to have counsel present during custodial interrogation. (*Edwards v. Arizona* (1981), 451 U.S. 477, 482-87, 68 L. Ed. 2d 378, 382-88, 101 S. Ct. 1880, 1883-86, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) An accused who is to be subject to custodial interrogation must first be warned of that right (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 724, 86 S. Ct. at 1628), and once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885; see also *Minnick v. Missis-*

*sippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486; *People v. Winsett* (1992), 153 Ill. 2d 335, 349-50).

The *Edwards* prohibition against further questioning is triggered, however, only when the defendant has invoked his fifth amendment right to have counsel present during custodial interrogation. (*McNeil v. Wisconsin* (1991), 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204; *People v. Kidd* (1992), 147 Ill. 2d 510, 533; *People v. Gacho* (1988), 122 Ill. 2d 221, 238.) The Supreme Court has stated that this requires, "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (Emphasis omitted.) *McNeil*, 501 U.S. at 178, 115 L. Ed. 2d at 169, 111 S. Ct. at 2209.

The trial judge in this case found that there was no credible evidence that the defendant requested the presence of an attorney for police interrogations. That conclusion is supported by the evidence. While the defendant testified that he told police officers at Area One and at Area Three that he wanted to wait for a lawyer before answering any questions, this testimony was flatly contradicted by the testimony of all the officers who questioned the defendant at Areas One and Three. Further, in the defendant's court-reported statement, he stated that he understood that he had the right to have an attorney present but that he nonetheless wished to proceed with his statement. It was up to the trial judge to resolve the conflict between the defendant's testimony and that of the police officers and assistant State's Attorneys. (*Gacho,* 122 Ill. 2d at 238.) The trial judge observed all of this testimony, and he was entitled to disbelieve the defendant's version of what transpired. We cannot find that the trial judge's ruling, that the defendant did not invoke his right to the presence of counsel during questioning, was against the manifest

weight of the evidence. The defendant's fifth amendment right to counsel was thus not violated, and the defendant's statements were not rendered inadmissible on this ground.

### Sufficiency of the Evidence

The defendant next contends that reversal of his murder conviction is required because the prosecution failed to prove, beyond a reasonable doubt, that the defendant's acts caused the death of Curtis Sims. We note that the defendant makes no challenge to the sufficiency of the evidence to establish any other element of the offense of murder. Rather, the defendant asserts only that the State failed to prove the causation element of the murder charge. The defendant's contention is not persuasive.

The defendant submits that Sims received gunshot wounds from a .45-caliber Uzi and a 9-millimeter handgun. The evidence bears out this assertion. The remainder of the defendant's argument in this regard, however, requires us to accept a particularly limited view of the evidence. The defendant's argument rests on the premise that the shots from the Uzi were fired by Macklin, rather than the defendant. From this premise, the defendant asserts that the State had the burden of proving that Sims' death did *not* result from the wound or wounds caused by the Uzi.[1] The defendant contends that the State failed to meet this burden and that the

---

[1]The defendant is apparently conceding in this argument that he fired the 9-millimeter weapon at Sims. Even without this tacit admission, however, there was clearly sufficient evidence from which to conclude that the defendant fired one of the two weapons which shot Sims. The defendant admitted that he was present at the scene with Macklin and was carrying a weapon. Christopher Posey described seeing two shooters, and the forensic evidence demonstrated that Sims was shot by both a .45-caliber weapon and a 9-millimeter weapon.

evidence was therefore insufficient to prove the defendant guilty of murder. We disagree.

The standard for reviewing the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *(People v. Kitchen* (1994), 159 Ill. 2d 1, 25.) The fact finder's verdict will not be overturned unless its verdict is so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. (*Kitchen*, 159 Ill. 2d at 25.) In order to prove a defendant guilty of murder (other than by accountability), the prosecution must prove, *inter alia*, that an act of the defendant contributed to the victim's death. (*People v. Brackett* (1987), 117 Ill. 2d 170, 177.) The defendant's act, however, need not be the sole or immediate cause of death; rather, it is sufficient if the defendant's act contributed to cause the death. *Brackett*, 117 Ill. 2d at 176.

In this case, the evidence was sufficient to prove, beyond a reasonable doubt, that an act of the defendant contributed to Sims' death. We must first take issue with the cornerstone premise of the defendant's argument, namely, that it was Macklin, not the defendant, who fired the .45-caliber Uzi at Sims. Our review of the record reveals that there was sufficient evidence from which the trial court could infer that it was the defendant who fired the Uzi. Officers Williamson and Trlak, the police officers who encountered the defendant and Macklin in the alley immediately after the shooting, both identified *the defendant* as having been carrying a "large black gun," while the other man, identified as Macklin, carried a handgun. Further, both of those officers inspected a .45-caliber Uzi during their testimony and stated that this gun resembled the weapon they had

seen the defendant carrying immediately after the shooting. Accordingly, we find that the trial court could have rationally concluded that the defendant shot Sims with the Uzi and, in that manner, caused or contributed to Sims' death.

Further, even if the defendant's assertion, that it was Macklin and not the defendant who fired the Uzi, is accurate, we would still find the evidence sufficient to prove the causation element of the prosecution's case. As noted, the defendant's act need only contribute to the victim's death to prove the defendant guilty of murder. (*Brackett*, 117 Ill. 2d at 176.) The evidence demonstrated that Sims was wounded by shots fired from both a .45-caliber weapon and a 9-millimeter weapon. The defendant does not dispute that he fired one of the two guns which shot Sims. The pathologist testified that Sims died as a result of "any three of [the wounds]." Thus, the evidence supported the inference that all three of the gunshots *contributed* to Sims' death. There was certainly no evidence to the effect that any of the three shots did *not* contribute to Sims' death. Thus, regardless of whether the defendant fired the Uzi or the 9-millimeter weapon, the evidence supported the conclusion that the defendant's act contributed to Sims' death. The defendant's contention that the State failed to prove the causation element of his crime is therefore without merit.

Having rejected both of the defendant's challenges to his murder conviction, we affirm the defendant's conviction for murder.

II

Sentencing Issues

*Validity of Jury Waiver*

The defendant first contends that his death sentence must be vacated because his waiver of a jury for sentenc-

ing was invalid. The defendant asserts that he was improperly forced by the trial judge into waiving a jury for sentencing, prior to trial, as a precondition to waiving a jury for trial. We agree that the defendant's waiver of a jury for sentencing was invalid. On that basis, we vacate the defendant's death sentence and remand for a new sentencing hearing.

The record reveals the following sequence of events leading up to the defendant's execution of a jury waiver for sentencing. Prior to trial, a conference was held in the trial judge's chambers to discuss the possibility of a plea bargain. That conference is not reported in the record; however, the judge later stated that he had told defense counsel that if the defendant were proven guilty, he would consider the death penalty as a sentence. On the day trial was set to begin, defense counsel informed the trial court that the defendant was "seeking to waive jury [*sic*] and have a bench trial." In response, the trial judge stated as follows:

> "All bets are off now. He's going to take a contested trial. Then that makes him—if I find him guilty, he will be eligible for the death penalty, and if I feel that the circumstances are such that he ought to die, I'm going to say so.
>
> But if he pleads guilty—since the State's Attorney of Cook County has allowed a white man to plead guilty under like circumstances and give him life imprisonment, I will give this young man the same thing.
>
> * * *
>
> *** If he takes a trial, all bets are off. If he qualifies, I will sentence him to the death penalty."

Defense counsel stated that he had "explained this to [the defendant] numerous times on numerous dates, and he understands." The following colloquy then took place:

> "THE COURT: All right.
>
> Do you understand, Cortez Brown, by saying you wish to waive a jury that you lose your *constitutional right to a*

*jury trial* in this case, and this case will then be heard and decided by this court without a jury? Is that what you wish?

THE DEFENDANT: Yes.

THE COURT: Execute the jury waiver.

[Prosecutor]: Is this waiving for the guilt phase or both phases?

THE COURT: It is a waiver for both phases.

[Defense Counsel]: At this time we are only seeking—

THE COURT: You can't have it both ways. So the young man has to make a decision.

[Defense Counsel]: He already made his decision.

THE COURT: Have him execute two jury waivers." (Emphasis added.)

The defendant thereafter signed a typewritten form which stated that he was waiving a jury for trial and a second typewritten form which also stated that he was waiving a jury for trial, but on which the handwritten words "for sentencing" had been inserted.

Following trial and sentencing, the defendant raised the matter again in his motion for a new death penalty hearing, charging that he was improperly compelled to execute a pretrial jury waiver for sentencing. At the hearing on the motion, the trial judge responded as follows:

"I didn't force him to jury waiver. I explained to him what he was waiving and he said he wanted to explain his case to the Judge on the guilt and innocence that he was willing to submit to the Court. I didn't force him not to, but I wasn't going to allow him to wait until after the jury had rendered a verdict of guilty to decide whether he was going to waive a jury for that purpose. I would have to select a brand new jury to hear all of the issues of the case, and that would have been a waste of the Court's time."

As the defendant correctly points out, the Illinois death penalty statute grants defendants the right to choose a jury for their death sentencing hearing even when they were convicted at a bench trial. (720 ILCS 5/9—1(d) (West 1994); see also *People v. Ramey* (1992),

151 Ill. 2d 498, 549.) The statute further provides that the death sentencing proceeding may be conducted before the trial judge alone only if the defendant "waives a jury for the separate proceeding." (720 ILCS 5/9—1(d)(3) (West 1994).) Thus, Illinois defendants have a statutory right to choose a bench trial for determination of their guilt or innocence, and yet choose to have a jury determine whether they will be sentenced to death. See *People v. Strickland* (1992), 154 Ill. 2d 489, 517; *People v. Buggs* (1986), 112 Ill. 2d 284, 291; *People v. Erickson* (1987), 117 Ill. 2d 271, 289 (noting that this right is guaranteed by statute, but is not of constitutional magnitude).

As noted, a defendant may choose to waive a jury for death sentencing. A waiver of a jury for death sentencing, like that for trial, must be knowing, intelligent and voluntary. (*Strickland*, 154 Ill. 2d at 517; *People v. St. Pierre* (1992), 146 Ill. 2d 494, 508; see also 725 ILCS 5/103—6 (West 1994) (jury must be "understandingly waived *** in open court").) Our decisions impose on the trial court the duty to ensure that a defendant's waiver is made expressly and understandingly. (*Strickland*, 154 Ill. 2d at 517; *People v. Smith* (1985), 106 Ill. 2d 327, 334; *County of McLean v. Kickapoo Creek, Inc.* (1972), 51 Ill. 2d 353, 356.) There is no precise formula for determining whether a waiver is validly accepted, but, rather, each case must turn on its own facts and circumstances. (*Strickland*, 154 Ill. 2d at 517; *St. Pierre*, 146 Ill. 2d at 508; *People v. Albanese* (1984), 104 Ill. 2d 504, 535.) In the context of a death penalty hearing, we have held that it is generally sufficient for the trial court to explain to the defendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone. *People v. Wiley* (1995), 165 Ill. 2d 259, 301; *People v. Ramey* (1992), 152 Ill. 2d 41, 59.

Turning to the facts of this case, we find that the defendant's waiver of a jury for sentencing was not shown to be sufficiently knowing, intelligent and voluntary. Defense counsel informed the trial court only that the defendant was seeking "to waive jury and have a bench trial." Defense counsel said nothing at that time regarding the defendant's sentencing proceeding. The trial judge then proceeded to admonish the defendant, in two sentences, regarding his waiver using language that pertained only to the waiver of a jury for trial. The judge's admonishment said nothing with regard to the defendant's right to a jury at sentencing. At best, it was unclear at this point whether the defendant was waiving a jury only for trial, or for both trial and sentencing. In fact, the prosecutor himself posed the question of whether the waiver pertained to just trial or to trial and sentencing. In response, *the trial judge*, not the defendant or his counsel, answered that the waiver was for "both phases." Defense counsel then attempted to inform the judge that the waiver was sought only for trial but was interrupted by the judge, who stated, "You can't have it both ways."

It is clear from this exchange that the trial judge in this case accepted the defendant's sentencing jury waiver without adequately ensuring that the waiver was made knowingly, intelligently and voluntarily. Given the circumstances, it was incumbent upon the trial judge to admonish the defendant in order to clarify the scope of his intended jury waiver. As noted, at a minimum the trial judge should have advised the defendant of his right to a jury for sentencing, independent of his right to a jury for trial, explained that he was waiving the right to have a jury consider the capital sentencing issues, and further explained that, as a result, the decision whether to impose the death penalty would be made by the judge alone. (*Ramey*, 152 Ill. 2d at 59.) The

trial judge, however, gave *no* admonishment whatsoever to the defendant concerning his right to a jury at sentencing. The defendant was never even asked in open court whether he wished to waive a jury "for the separate [sentencing] proceeding." 720 ILCS 5/9—1(d)(3) (West 1994).

The error in this case went beyond a failure to properly admonish. Not only did the trial judge neglect to admonish the defendant regarding his right to a jury for sentencing, the trial judge also misstated the law and affirmatively misled the defendant into tendering the sentencing waiver. The trial judge's comments informed the defendant that, if he wished to waive a jury for trial, he must also do so for sentencing. We can discern no other plausible interpretation of the judge's statement, "You can't have it both ways." This interpretation is borne out by the trial judge's comments in denying the defendant's post-sentencing motion, where he stated that allowing the defendant to wait until after trial to elect a jury for sentencing would be a "waste of the court's time." As noted, that procedure is not a "waste of time," but is a statutorily guaranteed right of the defendant. This misstatement seriously aggravated the harmful impact of the flaws in the admonishment process in this case. In essence, rather than telling the defendant that he had the right to have a jury decide all the capital sentencing issues and asking him if he wished to waive that right (*Ramey*, 152 Ill. 2d at 59), the trial judge here informed the defendant that he did *not* have that right.

In light of the circumstances surrounding the tendering of the sentencing waiver in this case, we must agree with the defendant that the trial judge did not ensure that the defendant's waiver was knowing, intelligent and voluntary. (*Strickland*, 154 Ill. 2d at 517.) We note, parenthetically, that while this court has declined

to adopt a fixed formula for determining whether a capital sentencing jury waiver is validly accepted, we have repeatedly approved of waivers accepted following trial judges' admonishments which were "painstaking, extensive, accurate, and without error." (*People v. Erickson* (1987), 117 Ill. 2d 271, 296; see, *e.g.*, *Strickland*, 154 Ill. 2d at 517 (waiver upheld where trial judge, prior to accepting waiver, explained at length the right to a jury at death sentencing and the respective roles of the judge and jury at death sentencing, and repeatedly questioned the defendant as to whether he wished to waive this right); *People v. Ashford* (1988), 121 Ill. 2d 55, 81-82 (waiver upheld where trial judge "painstakingly" admonished the defendant of his right to a jury and the roles and functions of the jury and judge at death sentencing such that the "record *** leaves no doubt" that the defendant's waiver was knowing and voluntary); *People v. Buggs* (1986), 112 Ill. 2d 284, 291-92 (waiver upheld where, following conviction, trial court advised defendant of right to a jury for death sentencing and respective roles of judge and jury at death sentencing, questioned defendant on several occasions on whether he wanted the judge or a jury for that purpose, gave defendant until date of death penalty hearing to make a decision, and, prior to accepting waiver, thoroughly questioned defendant to ensure that he was not operating under any misapprehensions).) It is evident in this case that the trial court's efforts cannot be described as painstaking or accurate.

Compounding the error in this case was the timing of the defendant's sentencing jury waiver. The defendant contends that he was entitled to defer his election of a judge or jury for capital sentencing until after conviction, and that the trial judge erred in forcing him to make that decision prior to trial. We agree.

This court has previously held that a defendant may

elect to tender a pretrial waiver of a capital sentencing jury and that, in such a case, the trial judge is required to accept the waiver if it is knowing and voluntary. (*People v. Erickson* (1987), 117 Ill. 2d 271, 287-88.) This court has not, however, addressed the question of whether the trial court may compel a defendant to decide, prior to trial, whether he wishes to waive a jury for capital sentencing. We now hold that a defendant may not be compelled to decide whether he desires a jury for capital sentencing until after he is convicted.

Under our death penalty statute, the death sentencing hearing is treated as a proceeding separate from the defendant's trial on guilt and innocence. (720 ILCS 5/9—1(d) (West 1994).) The statute envisions that, following conviction, the State will decide whether to request a death sentencing hearing. (720 ILCS 5/9—1(d) (West 1994).) We acknowledge that, in many cases, the State's intention to seek the death penalty will be manifested far earlier than after conviction. However, this court has held that the State is under no obligation to give notice prior to trial of its intention to seek the death penalty because to require such pretrial notice in all cases would defeat the prosecutor's informed exercise of his discretion. *People v. Gaines* (1981), 88 Ill. 2d 342, 369; see also *People v. Mahaffey* (1995), 166 Ill. 2d 1, 33.

Given that our statutory scheme clearly contemplates that the death sentencing hearing be treated as a separate proceeding from the defendant's trial, we can see no basis for requiring a defendant to make the jury waiver decision for both trial and sentencing at the same time. Moreover, considering that the State is not required to give pretrial notice of its intention to seek the death penalty, it would be incongruous to allow the defendant to be forced into deciding, pretrial, whether he wishes to have a jury for death sentencing. Forcing a defendant to choose between a judge and a jury for the

death penalty hearing prior to the completion of his trial may deprive the defendant of the opportunity to base that election on all relevant information, some of which may become available only during trial. The defendant is, of course, always free to choose to make this election prior to trial; however, we hold that he may not be compelled to do so. For this additional reason then, the defendant's waiver of a jury for death sentencing is invalid.

The State's primary response on the jury waiver issue is to assert that "it is apparent" that the defendant chose to waive a jury for sentencing "in the hopes that the trial court, based on its past record in this area, would not sentence him to death." In support of this assertion, the State points out that the defendant had been before this particular judge before, and that this judge had sentenced him to 30 months' probation for two controlled substance cases and a possession of a stolen vehicle case, and had sentenced him to a prison term of 35 years for the Boelter murder. Based upon these past events, the State submits that this judge had treated the defendant relatively leniently in the past, and that it is therefore "apparent" that the defendant voluntarily chose to waive a jury for sentencing. We are not persuaded by the State's assertion. The State's contention asks us to rely on nothing more than speculation in ascertaining whether the defendant knowingly and voluntarily waived his statutory right to a jury. The purpose for imposing a duty on the trial judge to ensure that the waiver is knowingly and voluntarily made (*Ramey*, 152 Ill. 2d at 59) is so that we may avoid the need to engage in speculation as to whether the defendant's waiver was properly accepted. Moreover, the State's theory that the defendant believed the trial judge would not sentence him to death is belied by the trial judge's repeated and unequivocal comments on the rec-

ord that "if he qualifies, I will sentence him to the death penalty." Finally, and most importantly, the State's argument does not address or mitigate the fact that the trial judge misstated the law and misled the defendant into believing that a sentencing jury waiver was required if he wished to waive a jury for trial.

The State also points to the fact that the defendant had previous experience with the criminal justice system and asks us to "presume" that, as a result, the defendant understood the nature of the right he was waiving. The record reveals, however, that the defendant had no previous experience which involved a death penalty hearing and, thus, there is no basis to presume that the defendant understood that he had the right to a jury for death sentencing and, in particular, that he had this right even if he chose a bench trial. The State further contends that the defendant's affidavit, filed with his post-trial motion, supports the validity of the defendant's waiver of a jury for sentencing because the defendant therein admits that, "when pressed to execute the sentencing waiver pre-trial I decided to waive jury [sic] for the penalty phase." Contrary to the State's assertion, the defendant's affidavit establishes only that the defendant executed the waiver, not that the waiver was knowing and voluntary, and is consistent with the conclusion that the defendant was improperly compelled to execute the waiver.

The State also contends, without citation to authority, that the defendant has waived this issue because he failed to object at the time he signed the two waivers and because he failed to move, prior to the commencement of the death sentencing hearing, to withdraw the previously executed jury waiver. We do not find waiver to be appropriate in this instance. This court has previously declined to apply waiver to a claim that a capital sentencing jury waiver was invalid, even though the de-

fendant failed to raise the issue at any time prior to appeal, on the ground that the issue implicated a substantial right of the defendant. (*People v. Buggs* (1986), 112 Ill. 2d 284, 290-91.) In addition, a number of cases, out of this court and our appellate court, have determined that the alleged invalidity of a jury trial waiver was not waived due to the importance of the right affected, even though the defendant failed to raise the issue in the trial court. (See, *e.g.*, *People v. Smith* (1985), 106 Ill. 2d 327, 332; *People v. Jennings* (1994), 268 Ill. App. 3d 439, 444; *People v. Roberts* (1994), 263 Ill. App. 3d 348, 350; *People v. Evans* (1993), 243 Ill. App. 3d 72, 76-77; *People v. Hall* (1991), 221 Ill. App. 3d 864, 867.) In this case, the defendant did raise the issue in the trial court. The issue was included in the defendant's post-sentencing motion, and the exchange between defense counsel and the court prior to the execution of the waivers demonstrated the defense's disagreement with the trial judge's handling of the matter. With regard to the failure to move to withdraw the jury waiver prior to the death sentencing hearing, this circumstance does not support a finding of waiver. The record reveals that the trial judge, immediately upon finding the defendant guilty of the Sims murder, went on to find the defendant eligible for the death penalty, without any additional evidence or hearing. Given this sequence of events, it appears that there was no opportunity, after the guilty verdict, for the defense to attempt to withdraw the jury waiver for sentencing. Taking into account these circumstances, as well as the substantial nature of the right affected, and the egregious nature of the errors which led to the jury waiver, we decline to find that the defendant waived review of this issue. We do not suggest that the validity of a capital sentencing jury waiver will in every case warrant review. Under the particular facts of this case, however, we find that application of the waiver rule is not appropriate.

For the reasons stated above, we hold that the defendant's waiver of a jury for sentencing was invalid. We therefore vacate the defendant's death sentence and remand this cause for a new death sentencing hearing.

In light of our decision to remand this case for a new sentencing hearing, double jeopardy requires that we address the defendant's challenge to the sufficiency of the evidence supporting his eligibility. See *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852; *People v. Davis* (1986), 112 Ill. 2d 78, 82 (determination on review that defendant was not eligible for death penalty would operate as acquittal of element essential to a sentence of death and double jeopardy would bar second capital sentencing hearing).

### Eligibility

The defendant challenges the sufficiency of the evidence to establish his eligibility for the death penalty. The defendant argues that, because his conviction for the Boelter murder was reversed on appeal, the finding that he was eligible for death based upon the multiple-murder aggravating factor (720 ILCS 5/9—1(b)(3) (West 1994)) has been invalidated. The defendant further contends that no other eligibility factor was proven to exist.

We find that the evidence was sufficient to support the defendant's eligibility, despite the reversal of his Boelter murder conviction.[2] This court has repeatedly recognized that the Illinois death penalty statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single factor. (See *People v. Hampton* (1992), 149 Ill. 2d 71, 90; *People v.*

---

[2]It must be emphasized that the defendant's conviction for the Boelter murder was not reversed based upon insufficiency of the evidence, but upon trial error, and was remanded for a new trial.

*Coleman* (1989), 129 Ill. 2d 321, 345.) The finding of a statutory aggravating factor at the eligibility phase serves to narrow the class of persons who may be sentenced to death and once one such factor is proved, the defendant is eligible, regardless of whether other factors have been proved as well. (*Hampton,* 149 Ill. 2d at 91.) Thus, where a defendant is found eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility. *People v. Page* (1993), 156 Ill. 2d 258, 268, citing *Zant v. Stephens* (1983), 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50; see also *People v. Pasch* (1992), 152 Ill. 2d 133, 188-89; *Hampton,* 149 Ill. 2d at 91.

In this case, the trial judge's sentencing order stated that two statutory aggravating factors were found to exist: multiple murder (720 ILCS 5/9—1(b)(3) (West 1994)) and murder committed in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1994)). Consequently, as long as section 9—1(b)(11) eligibility was found in this case, the reversal of the defendant's conviction for the Boelter murder will not impair the defendant's eligibility for the death penalty.

Section 9—1(b)(11) of the Criminal Code of 1961 provides that a statutory aggravating factor sufficient to render a defendant eligible for the death penalty exists if:

> "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." (720 ILCS 5/9—1(b)(11) (West 1994).)

The defendant submits that this factor must be given a

limiting interpretation in order to avoid being unconstitutionally vague. The defendant contends that, when such a limiting interpretation is applied to this case, the section 9—1(b)(11) factor was not shown to exist.

We note that this court rejected the argument that the term "cold, calculated and premeditated," as used in section 9—1(b)(11), was unconstitutionally vague in *People v. Johnson* (1993), 154 Ill. 2d 356, 372-73. The defendant nevertheless urges that, in order to be constitutionally valid, section 9—1(b)(11) must be narrowly interpreted to require that the defendant "kill without feeling or sympathy, pursuant to a personal, preconceived, predetermined plan, and the plan's object must be the taking of human life by unlawful means." We need not decide whether such a "limiting" interpretation is constitutionally required because, even applying this interpretation, the evidence in this case was sufficient to prove the existence of this factor.

The evidence showed that, at approximately midnight on June 8, 1990, the defendant and Macklin, both members of the same street gang, formed a plan to go to a particular location for the purpose of killing members of a rival gang. The defendant admitted in his statements that he understood killing to be the purpose of this mission. Steps were taken to carry out this plan: a rental car was obtained and both the defendant and Macklin obtained guns. The plan was not carried out until almost three hours later, at approximately 2:40 a.m., when the defendant, Macklin and Walker drove the rental car to the predetermined location. The defendant and Macklin were dropped off by Walker down the street from the location of the intended shooting, a circumstance suggesting that the shooters wished to surprise their victims. The defendant and Macklin then walked to a particular address where two men were sitting on the porch and, without any provocation or warn-

ing, opened fire on the men, spraying the porch with gunfire. Sims was shot in the back and buttocks as he tried to flee the attackers. Although the defendant claimed in his statement to have fired no shots, there was evidentiary support for the conclusion that the defendant fired at the two men, and that he fired the .45-caliber Uzi. The evidence also showed that, during the shooting, Walker remained in the area to provide a getaway vehicle, of which the defendant took advantage after being pursued by police officers.

We find that this evidence was sufficient to support the conclusion that the defendant killed "without feeling or sympathy, pursuant to a personal, preconceived, predetermined plan, and the plan's object [was] the taking of human life by unlawful means." Thus, applying the defendant's own "limiting" interpretation of section 9—1(b)(11), the evidence was sufficient to prove the existence of that factor.

The defendant also contends that his eligibility could not be premised upon section 9—1(b)(11) because he was not given prior notice that this factor could be applied to find him eligible and because the trial judge did not actually rely on this factor to find him eligible.

The defendant's lack-of-notice argument is unavailing. As the State points out, this court has held that the prosecution is not obligated to specify those aggravating factors on which it intends to rely for eligibility. (*People v. Owens* (1984), 102 Ill. 2d 88, 106-07.) The defendant nevertheless urges that the United States Supreme Court's decision in *Lankford v. Idaho* (1991), 500 U.S. 110, 114 L. Ed. 2d 173, 111 S. Ct. 1723, compels the opposite holding. *Lankford* does not stand for the proposition suggested by the defendant.

In *Lankford,* the prosecution formally notified the defense and the trial court, after the defendant's conviction, that it would not recommend the death penalty for

the defendant. At the sentencing hearing, the State explained that it was not seeking the death penalty and there was no discussion of the death penalty as a possible sentence. Following the hearing, the trial court sentenced the defendant to death. The Supreme Court reversed the defendant's death sentence, finding that the defendant was denied due process because he had no notice that the death penalty was a possible sentence and no opportunity to present evidence or argument against that sentence. *Lankford*, 500 U.S. at 123, 114 L. Ed. 2d at 185-86, 111 S. Ct. at 1731.

*Lankford* thus addressed a situation very different from that presented in this case. Here, no contention can be made that the defendant was in any manner misled into believing that the death penalty was not a possible sentence. In *People v. Davis* (1991), 144 Ill. 2d 349, this court distinguished *Lankford* on the ground that the defendant in *Davis* was continuously aware that the death penalty was a possible sentence. *Lankford* does not control this case for the same reason. Accordingly, on the basis of this court's previous holdings, we reject the defendant's contention that his eligibility under section 9—1(b)(11) is invalid based on lack of notice.

We also reject the defendant's contention that the trial judge did not actually rely on section 9—1(b)(11) to find him eligible. The judge's sentencing order, which he read into the record, listed both section 9—1(b)(3) and section 9—1(b)(11) as the statutory aggravating factors found to exist. The defendant concedes that this order referred to those two factors as the factors on which the defendant's eligibility was premised. The trial judge also referred to section 9—1(b)(11) in his comments at the close of the sentencing hearing, detailing the evidence which he found established that factor. The defendant's primary complaint seems to be that the trial judge did not specifically mention section 9—1(b)(11)

until after evidence was heard at the aggravation-mitigation phase of the sentencing hearing. This court has held, however, that while it is preferable for the trial court, when acting as sentencer, to state its conclusions on eligibility prior to proceeding to the aggravation-mitigation phase, this sequencing of events is not mandated. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 449; *People v. Albanese* (1984), 104 Ill. 2d 504, 539.) Accordingly, while the trial judge here did not, in this respect, adhere to the preferred method for conducting the sentencing hearing, this deviation did not invalidate the section 9—1(b)(11) eligibility finding.

We thus find that the evidence was sufficient to support a finding that the defendant was eligible for death under section 9—1(b)(11). As a result, there is no double jeopardy impediment to a new capital sentencing hearing. We, however, in no manner imply that we have made a finding as to the defendant's eligibility that would be binding on remand. See *People v. McDonald* (1988), 125 Ill. 2d 182, 202.

### *Constitutionality of Illinois Death Penalty*

As a final matter, we briefly dispose of the defendant's challenge to the constitutionality of the Illinois death penalty statute. The defendant's sole contention in this regard is based upon a dissenting opinion in a United States Supreme Court opinion, in which Justice Blackmun argued that no death penalty system can meet the requirements of the eighth amendment because no system can both eliminate arbitrary imposition of the sentence and, at the same time, avoid impermissibly restricting the sentencer's discretion. This court has previously rejected arguments that the Illinois death penalty statute is unconstitutional because it does not allow for an individualized sentencing determination (*People v. Simms* (1991), 143 Ill. 2d 154, 184), and that it does not sufficiently minimize the risk of

arbitrarily imposed death sentences (*People v. Patterson* (1992), 154 Ill. 2d 414, 488). It has also noted that dissenting opinions from the United States Supreme Court do not provide adequate grounds for reconsidering our prior precedent upholding the constitutionality of our death penalty scheme. (*People v. Harris* (1989), 129 Ill. 2d 123, 166.) We therefore reject the defendant's contention that the Illinois death penalty statute is unconstitutional.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction and vacate the defendant's death sentence. This cause is remanded to the circuit court for a new sentencing hearing.

*Conviction affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE HARRISON took no part in the consideration or decision of this case.