NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion

to request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter,

it cannot be considered the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of Decisions in the Official

Reports advance sheets following final action by the Court.

                                    

                  Docket No. 77569--Agenda 2--May 1996.

       THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JONATHAN

                           HAYNES, Appellant.

                     Opinion filed October 24, 1996.

                                    

     CHIEF JUSTICE BILANDIC delivered the opinion of the court:

     The defendant, Jonathan Haynes, was indicted on three counts

of murder (720 ILCS 5/9--1(a)(1), (a)(2), (a)(3) (West 1992)) and

one count of burglary (720 ILCS 5/19--1 (West 1992)) arising out of

the August 6, 1993, shooting death of Dr. Martin Sullivan in

Wilmette, Illinois. Following a bench trial in the circuit court of

Cook County, the defendant was found guilty on all counts. The

defendant waived a jury for death sentencing. The trial court found

that the defendant was eligible for the death penalty. 720 ILCS

5/9--1(b)(6), (b)(11) (West 1992). The trial court further found

that there were no mitigating factors precluding imposition of the

death penalty and, accordingly, sentenced the defendant to death.

The defendant's death sentence has been stayed pending his direct

appeal to this court. 134 Ill. 2d Rs. 603, 609(a). We now affirm

the defendant's convictions for intentional murder and burglary and

sentence.

                                   FACTS

     Prior to the defendant's trial, a hearing was held to

determine the defendant's fitness to stand trial. The defendant

waived a jury for this hearing, and the hearing proceeded before

the trial judge. Expert witnesses testified on behalf of both the

State and the defendant. The testimony given by these witnesses is

discussed in detail later in this opinion. After hearing the

evidence, the trial court ruled that the defendant was fit to stand

trial.

     Immediately after the trial court ruled on the defendant's

fitness, the defendant informed the court that he wished to proceed

without counsel. The trial court accepted the defendant's waiver of

counsel and appointed two assistant public defenders to act as

standby counsel. The defendant proceeded to represent himself at

his trial and death sentencing hearing. The defendant waived a jury

for trial.

     At trial, the defendant admitted murdering Dr. Martin

Sullivan. The defendant delivered an opening statement in which he

condemned "fake Aryan cosmetics," in particular, bleached blond

hair, blue tinted contact lenses and plastic surgery. The defendant

further stated that, in committing his "murders," he had issued a

challenge to society to act "in accordance with your stated ideals

of human equality."

     The State's evidence established that, at approximately 2:15

p.m. on August 6, 1993, a man who identified himself as "John

Rothmann" entered the office of plastic surgeon Dr. Martin Sullivan

in Wilmette, Illinois. This "John Rothmann" had earlier contacted

the office and scheduled an appointment for this time with Dr.

Sullivan to discuss undergoing a rhinoplasty. Witnesses in the

office later identified the defendant as the man who had identified

himself as "John Rothmann." After sitting in the waiting area, the

defendant was shown into examination room 1, a room with only one

door. Dr. Sullivan entered examination room 1 shortly after the

defendant. Several minutes later, office employees heard loud

noises, including "popping" noises and glass shattering coming from

examination room 1. The door to examination room 1 opened and the

defendant ran out of the room and out of the office suite. Dr.

Sullivan stumbled bleeding out of examination room 1 and asked

someone to call an ambulance because he had been shot. An ambulance

arrived at the scene a few minutes later and transported Dr.

Sullivan to the hospital. Dr. Sullivan died as a result of his

injuries. An autopsy revealed that Dr. Sullivan had sustained three

gunshot wounds to the chest and a graze wound to the head. The

shots had been fired at close range, from 18 to 24 inches away.

     On the evening of August 6, 1993, Mitchell Lifson, an

administrative aide for State Representative Jeff Schoenberg, saw

a television news report of the Sullivan murder. The report

identified the perpetrator as "John Rothmann" and included a

description of the man. Lifson recalled that, at approximately

10:45 a.m. that day, the defendant, using the name "John Rothmann,"

had come into Representative Schoenberg's office and spoken to

Lifson. The Representative's office is located about three or four

blocks from Dr. Sullivan's office. Lifson told the defendant that

the Representative was not available and asked for the defendant's

name. The defendant was hesitant to divulge his name, though he

eventually did identify himself as "John Rothmann," and refused to

leave his telephone number. When Lifson spoke to Representative

Schoenberg about the defendant a short time later, the

Representative told Lifson to obtain the defendant's license plate

number if possible.

     Lifson left the office at about 12:15 p.m. As he was leaving,

he noticed the defendant standing next to a light-blue Volkswagen

Beetle with Maryland license plates. Lifson wrote down the license

plate number. Thereafter, when Lifson heard on the news that police

were looking for a "John Rothmann," he contacted Wilmette police

and gave them his information. Lifson identified the defendant as

the man who had come to the Representative's office on August 6,

1993.

     The name "John Rothmann," a description of his vehicle with

the license plate number and a police sketch were distributed to

local police agencies. In the early morning hours of August 8,

1993, a Skokie police officer observed a vehicle that matched the

distributed description and license plate number driven by a white

male. The officer stopped the vehicle and the driver identified

himself as Jonathan Haynes. The officer identified the defendant as

the man driving the car.

     The defendant was taken into custody by Wilmette police. After

being read Miranda warnings, the defendant requested a pen and some

paper so that he could write a statement. The defendant also gave

an oral statement to Wilmette police detectives. In that statement,

the defendant stated that he telephoned Dr. Sullivan's office on

August 3 or 4, 1993, and made an appointment for August 6, 1993, at

2:15 p.m. under the name "John Rothmann." The defendant described

that he arrived in Wilmette at around noon on August 6 and first

went to Representative Schoenberg's office. The defendant wanted to

ask the Representative some questions about problems he perceived

in society. After leaving the Representative's office, the

defendant drove to a gas station located next to Dr. Sullivan's

office and parked his car in that lot. At almost exactly 2:15 p.m.,

the defendant left his car and walked to Dr. Sullivan's office. The

defendant related that, upon entering the office, he identified

himself as John Rothmann and filled out patient identification

forms using that name. He was shown into an examination room at

about 2:50 p.m., where he waited for Dr. Sullivan for approximately

10 minutes. After Dr. Sullivan walked into the room and introduced

himself, the defendant pulled out a gun and started shooting at

him. The defendant stated that the gun was a blue steel Colt .38

Special revolver. After the first shot, Dr. Sullivan reached for

the gun and the two men grappled for it. The defendant stated that

he pulled the trigger seven times, firing six rounds. After the

last shot, the defendant ran out of the examination room and out of

the office. The defendant ran back to his car and drove away. The

defendant described in his statement that he had planned an escape

route and he sketched the detectives a diagram of that route. The

defendant also stated that he had deliberately chosen a parking

spot which allowed him a quick escape.

     The defendant further related, in this statement, his reason

for choosing Dr. Sullivan. The defendant said that he had decided

to kill a plastic surgeon and Dr. Sullivan had the largest

advertisement in the Yellow Pages. The defendant relayed that he

had waited to shoot Dr. Sullivan in his office so that he could be

sure that he killed the right person. The defendant also told

police that he had arrived in the Chicago area about a month

earlier for the express purpose of killing Charles Stroupe, who

lived in Lake Forest, Illinois. The defendant desired to kill

Stroupe because he was the president of Wesley Jensen Corporation,

which, according to the defendant, was the original and largest

manufacturer of blue tinted contact lenses. The defendant told

police that he had conducted surveillance of Stroupe's home, and

had attempted to kill Stroupe on August 2, 1993, but had been

unable to perpetrate the killing. As a result, the defendant

decided to target a plastic surgeon instead. The defendant stated

that he remained in the Chicago area after killing Dr. Sullivan so

that he could again attempt the murder of Stroupe. Finally, the

defendant relayed that his purpose in killing Dr. Sullivan and in

trying to kill Stroupe was to strike out against those who promoted

"fake Aryan beauty."

     The defendant's written statement was also read into evidence.

In addition to confessing to the murder of Dr. Sullivan and the

attempted murder of Charles Stroupe, the written statement included

the defendant's confession to the 1987 murder of Frank Ringi in San

Francisco, California. Ringi, the defendant described, was a hair

colorist. In that statement, the defendant again described his

motivation for the murders as the condemnation of fake Aryan

cosmetics. The defendant also stated that he had "fallen in love"

with the "beauty of the Hitler youth" at the age of 12, and that he

was "fundamentally in sympathy" with the neo-Nazi movement.

     Police searched the defendant's car and apartment. Inside the

car, police recovered a page torn from the Yellow Pages, which

contained Dr. Sullivan's advertisement. In the apartment, the

police found a loaded pistol, later identified through forensic

testing as the murder weapon. Also found in the apartment was a

cassette tape marked "taped confession," which was played at trial.

In this tape, the defendant stated that he had killed two persons

and that he was "quite happy" with the murders. The tape was meant

to be sent to cosmetics industry executives to warn them against

perpetuating fake Aryan cosmetics. The police also found the

defendant's diary, the contents of which was read into evidence.

Therein, the defendant detailed his plans to kill Charles Stroupe

and described that he had killed Dr. Sullivan.

     The defendant presented no evidence at trial, other than his

own testimony. In that testimony, the defendant admitted killing

Dr. Sullivan and again reiterated that his motivation was to make

a statement condemning fake Aryan cosmetics. The defendant

explained that "we fought World War II against the reality of Aryan

beauty and now we are trying to fake it with cosmetics." The

defendant also made a closing argument in which he again confessed

to the murders of Dr. Sullivan and Frank Ringi.

     The trial court found the defendant guilty as charged in the

indictment of intentional murder (720 ILCS 5/9--1(a)(1) (West

1992)), knowing murder (720 ILCS 5/9--1(a)(2) (West 1992)), felony

murder (720 ILCS 5/9--1(a)(3) (West 1992)), and burglary. The

defendant waived a jury for the capital sentencing hearing. The

trial court found that the defendant was eligible for death on two

grounds: (1) that the defendant had committed the murder in the

course of another felony, burglary (720 ILCS 5/9--1(b)(6) (West

1992)), and (2) that the murder was committed in a cold, calculated

and premeditated manner pursuant to a preconceived plan (720 ILCS

5/9--1(b)(11) (West 1992)). The State thereafter presented evidence

in aggravation.

     Dr. Mathew Markos, a psychiatrist, testified for the State.

Dr. Markos stated that he had considered whether the defendant had

committed the murder of Dr. Sullivan while he was under the

influence of an "extreme mental or emotional disturbance," the

standard under the statutory mitigating factor contained in section

9--1(c)(2) of the death penalty statute (720 ILCS 5/9--1(c)(2)

(West 1992)). In Dr. Markos' opinion, the defendant was not

operating under the influence of any such disturbance at the time

of the murder.

     Thomas Trulli also testified for the State in aggravation.

Trulli was the life companion and business partner of Frank Ringi.

Trulli identified the defendant as the man who, identifying himself

as "John Rockman," had entered their San Francisco hair salon on

May 27, 1987, for a consultation with Ringi. After the defendant

entered the consultation room with Ringi, Trulli heard Ringi shout

and heard three "popping" sounds. Trulli entered the room and the

defendant shot him in the abdomen. Ringi had fallen to the floor.

As a result of the shooting, Trulli was in surgery for 17 hours and

was hospitalized for three weeks. Ringi died as a result of the

shooting. Following the murder, business at the salon declined to

the point where Trulli was forced to file for corporate bankruptcy.

     The defendant's confession to the murder of Frank Ringi, given

to San Francisco police detectives after the Sullivan shooting, was

also entered into evidence. Therein, the defendant admitted that he

went to Ringi's salon on May 27, 1987, in order to kill him. He

killed Ringi because he advertised himself as a hair colorist. The

defendant stated that he was "not repentant" for this crime,

although he knew that it was against the law. The defendant also

stated in this statement that he believed that "Jews" wanted to

control this country and that the population was growing

increasingly uglier. The defendant also relayed that he is a

"loner" and does not affiliate with any groups.

     The State also presented testimony from Detective Brian King

of the Wilmette police department. Detective King testified that

the defendant said that it was his plan, after he had committed

three murders, to send newspaper accounts of those murders to

fashion magazines.

     The State presented evidence that the defendant had been

employed as a chemist with the Federal Bureau of Alcohol, Tobacco

and Firearms in Maryland from November 17, 1991, to March 26, 1993.

In addition, a certified copy of the defendant's birth certificate,

showing his date of birth as October 3, 1958, was admitted into

evidence.

     Finally, the written statements of Dr. Sullivan's wife and

seven of his eight children were read into evidence. In those

statements, Dr. Sullivan was described as a caring father and

husband, and a strong role model for his children and 21

grandchildren. Those statements also relayed that Dr. Sullivan's

practice specialized in the repair of cleft lips and palates in

infants. Dr. Sullivan also performed reconstructive surgery on

accident victims and had performed charity work for the past 32

years. According to the statements, Dr. Sullivan was 68 years old

when he died, was in very good health and planned to retire soon.

     With this evidence, the State rested in aggravation. The trial

court thereafter gave the defendant time to consult with standby

counsel and with his parents. After this consultation, the

defendant informed the court that he wished to present no

mitigation evidence other than his own statement. The defendant

gave a very brief statement in which he again condemned fake Aryan

cosmetology.

     The trial court denied standby counsel's request that the

court consider a memorandum of mitigation evidence and a letter

from Dr. Karen Smith offered in mitigation. Those documents are

contained in the record. The mitigation memorandum, prepared by the

public defender's office, urged that the statutory mitigating

factor of "extreme mental or emotional disturbance" (720 ILCS 5/9--

1(c)(2) (West 1992)) was present. Dr. Smith's letter concluded that

the defendant suffered from paranoid schizophrenia at the time of

the crime and was therefore legally insane when he committed the

crimes.

     After hearing the evidence, the trial court ruled that there

were no mitigating circumstances sufficient to preclude a sentence

of death. The trial court accordingly sentenced the defendant to

death.

                                 ANALYSIS

                              Fitness Hearing

                    Waiver of Jury for Fitness Hearing

     The defendant charges that the trial court committed

reversible error in accepting his waiver of a jury for the fitness

hearing. We find no error in this regard.

     The defendant's fitness hearing was set to begin on March 2,

1994. At the start of proceedings on that date, defense counsel

appeared for the defendant and stated that a jury had been

requested for the hearing. One of the prosecutors then informed the

trial judge that the defendant had indicated, during one of his

fitness examinations, that he wished to proceed without a jury. The

trial judge questioned the defendant on this issue:

               "THE COURT: *** I am going to ask him. You have a

          right, not a constitutional right, Mr. Haynes, to have

          this issue concerning whether you are legally competent

          mentally to stand trial in this criminal case to be

          decided by a jury of six persons, this is a civil

          proceeding, or whether you want to present--whether that

          issue can be presented to the Court sitting without a

          jury.

               The decision is yours to make, and I am asking you

          to make that decision. Do you want six people seated in

          this jury box to hear evidence from your doctors and

          other persons concerning your mental status and your

          legal competence to stand trial, or do you want to have

          the Court make that decision without the jury?

               Tell me.

               THE DEFENDANT: I wish the Court to make that

          decision."

The defendant thereafter executed a written waiver of a jury for

the fitness hearing. The defendant now contends that the trial

court incorrectly accepted his jury waiver when defense counsel had

already demanded a jury for the proceeding.

     There is no constitutional right to a jury at a hearing to

determine fitness to stand trial. People v. Manning, 76 Ill. 2d

235, 239 (1979). Our legislature, however, has made provisions for

a jury to determine the issue of a defendant's fitness under some

circumstances. 725 ILCS 5/104--12 (West 1992). Section 104--12 of

the Code of Criminal Procedure of 1963 provides:

               "Right to Jury. The issue of the defendant's fitness

          may be determined in the first instance by the court or

          by a jury. THE DEFENSE or the State may demand a jury or

          the court on its own motion may order a jury. However,

          when the issue is raised after trial has begun or after

          conviction but before sentencing, or when the issue is to

          be redetermined under Section 104--20 or 104--27, the

          issue shall be determined by the court." (Emphasis

          added.) 725 ILCS 5/104--12 (West 1992).

     The defendant's argument rests upon the wording of this

statutory provision. The defendant asserts that section 104--12, by

use of the term "the defense," gives the right to demand or waive

a jury to defense counsel and not to the defendant himself. In most

cases, the defendant reasons, defense counsel's decision on this

issue will coincide with the defendant's wishes. However, the

defendant posits, in the rare situation such as that presented

here, where defense counsel has demanded a jury and the defendant

expresses a desire to waive a jury, defense counsel's decision

predominates. In essence, the defendant argues that the defendant

does not personally have the right to waive a jury for the fitness

determination. The defendant's contention is without merit.

     This court has held "[i]t is clear that an accused may waive

a jury in a proceeding to determine his competency." People v.

Lyons, 42 Ill. 2d 437, 440 (1969); see also People v. Brown, 43

Ill. 2d 79, 82 (1969). The defendant acknowledges this holding and

concedes that, at the time of that holding and up until the

legislature enacted the current version of the fitness jury statute

in 1979, a defendant had the statutory right to waive a jury for

his fitness hearing. He argues, however, that the legislature

altered that rule in enacting the current version of section 104--

12.

     The defendant emphasizes that, prior to the 1979 change, the

fitness jury provision provided that "the defendant" (in addition

to the State or the court) could demand a jury. Ill. Rev. Stat.

1977, ch. 38, par. 1005--2--1(d). In 1979, the section was changed

to provide, as noted above, that "the defense" may demand a jury.

The defendant contends that, in substituting "the defense" for "the

defendant," the legislature intended to take away from the

defendant the right to demand or waive a jury and to give that

right to defense counsel instead. The defendant's interpretation of

the statute is erroneous.

     In construing a statute, a court's duty is to ascertain and

give effect to the intent of the legislature. People v. Parker, 123

Ill. 2d 204, 209 (1988). In determining that intent, a court must

look first to the language of the statute and interpret that

language in accordance with its plain and ordinary meaning. People

v. Ross, 168 Ill. 2d 347, 350 (1995). We find that the plain and

ordinary meaning of the phrase "the defense," as used in section

104--12, does not exclude the defendant. "The defense," as used in

this context, is commonly considered to connote the "team" or the

"side" that is defending. This definition does not exclude the

defendant, but clearly encompasses him as a part of "the defense

team." We note that, in other sections of article 104 of the Code

of Criminal Procedure, the article pertaining to fitness matters,

the legislature expressly referred to "the attorney for the

defendant" or "defendant's counsel" where it sought to refer to

defense counsel. See 725 ILCS 5/104--23(a), 104--27(c) (West 1992).

Had the legislature intended, in section 104--12, to grant the

right to demand or waive a jury solely to defense counsel, to the

exclusion of the defendant, it would have used specific language to

that effect. We thus conclude that the plain language of section

104--12 does not evince an intent to alter the defendant's right to

demand or waive a jury for the fitness determination.

     The legislative history surrounding the 1979 change in the

fitness jury provision confirms our conclusion. This change was

effected as part of a major overhaul of the statutory provisions

governing fitness for trial and sentencing. Public Act 81--1217,

effective December 28, 1979, repealed previous provisions regarding

fitness (Ill. Rev. Stat. 1977, ch. 38, pars. 1005--2--1, 1005--2--

2), and replaced them with sections 102--21 and 104--10 through

104--29 of the Code of Criminal Procedure. The new sections

provided detailed procedures to be employed in determining fitness

and dealing with unfit defendants. Thus, changing "the defendant"

to "the defense" was not the only, and was certainly not the most

significant, change wrought by Public Act 81--1217.

     Moreover, the debates in the legislature leave little doubt as

to the motivating factor behind the legislative overhaul. The

legislators' comments reveal that the primary purpose of the act

was to address situations such as that in the much-publicized case

of Donald Lang. This court issued an opinion in Lang's case in May

1979. People v. Lang, 76 Ill. 2d 311 (1979). As noted in that

opinion, Lang was an illiterate, deaf-mute with virtually no

communicative abilities who, over the course of 14 years, had been

twice charged with murder, but had been found unfit for trial and

not civilly committable. According to the House debates, Public Act

81--1217 was the result of the Lang case and was intended to bridge

a "glaring gap" in the statutory framework for dealing with unfit

defendants. 81st Ill. Gen. Assem., House Proceedings, June 19,

1979, at 75 (statements of Representative Daniels). Under the then-

existing framework, persons such as Lang went into a "procedural

limbo," and the bill was intended to alleviate that problem by

creating "a comprehensive statute that covered defendants who are

found not fit to stand trial and sets up a series of hearings and

treatments for such persons." 81st Ill. Gen. Assem., House

Proceedings, July 1, 1979, at 61 (statements of Representative

Daniels).

     Accordingly, the relevant legislative history provides no

support for the defendant's interpretation of section 104--12. The

1979 act was primarily intended to address the concerns raised by

the Lang case. According to this court's opinion in that case, it

does not appear that the Lang case involved any issue relating to

the waiver of a jury for fitness. We thus find no basis for holding

that, in changing "the defendant" to "the defense," the legislature

sought to effect the change suggested here by the defendant. The

more rational explanation for this very minor change in wording is

that the drafters used the word "defense" to allow defense counsel

to speak on the defendant's behalf to inform the court of the

defendant's wishes on this issue. We therefore reject the

defendant's contention that section 104--12 grants only defense

counsel, and not the defendant, the right to demand or waive a

jury.

     The defendant nonetheless argues that logic compels the rule

he proposes. The defendant asserts that, where a bona fide doubt of

a defendant's fitness has been raised (as there must be for a

fitness hearing to take place), it is not logical to allow that

potentially unfit defendant to personally make the decision whether

to have a jury decide his fitness. This court rejected this precise

argument in People v. Brown, 43 Ill. 2d 79, 82 (1969), stating:

               "Defendant asserts, however, that it is inconsistent

          to try a person's competency to stand trial and at the

          same time accept his tendered jury waiver as being

          understandingly made. This argument has some surface

          appeal, but we do not think it makes a tendered jury

          waiver a nullity as defendant contends. The other side of

          the coin is that it would be reversible error for the

          trial court to deny a competent defendant's jury waiver."

          Brown, 43 Ill. 2d at 82.

     The defendant acknowledges the holding in Brown, but urges a

different result here. We see no reason not to adhere to the Brown

court's resolution of this issue. The defendant concedes that, up

until 1979, the legislature expressly granted defendants in this

situation the right to demand or waive a jury, apparently finding

no lack of logic in that procedure. We have held that the 1979

change in the fitness jury statute did not take away that right. We

therefore continue to adhere to the Brown court's rejection of this

argument. We find no inherent inconsistency in upholding the

legislature's grant to defendants of the right to decide whether a

jury will determine their fitness for trial.

     In a related argument, the defendant contends that the

acceptance of his jury waiver was improper because it was based

upon the trial judge's "unsubstantiated personal belief" that the

defendant's judgment was not impaired even if he was mentally ill.

Having found that the defendant possessed the statutory right to

decide whether to have a jury determine fitness, we agree with the

State that there is no need to consider the trial court's "reason"

for accepting the defendant's waiver. Accordingly, we hold that the

trial court properly held the defendant's fitness hearing without

a jury.

                              Fitness Finding

     The defendant next contends that the trial court's ruling that

he was fit to stand trial must be reversed. The defendant makes

several arguments in this regard.

                    A. Manifest Weight of the Evidence

     The defendant asserts that the trial court's ruling on fitness

was against the manifest weight of the evidence. We find the

evidence was sufficient to support the finding of fitness.

     The due process clause of the fourteenth amendment prohibits

the prosecution of a defendant who is not fit to stand trial.

Medina v. California, 505 U.S. 437, 439, 120 L. Ed. 2d 353, 359,

112 S. Ct. 2572, 2574 (1992); People v. Brandon, 162 Ill. 2d 450,

455 (1994). Under Illinois law, a defendant is presumed to be fit

to stand trial, and will only be considered unfit if, because of

his mental or physical condition, he is unable to understand the

nature and purpose of the proceedings against him or to assist in

his defense. 725 ILCS 5/104--10 (West 1992); People v. Eddmonds,

143 Ill. 2d 501, 512 (1991). Fitness speaks only to a person's

ability to function within the context of a trial; a defendant may

be fit to stand trial even though his mind is otherwise unsound.

Eddmonds, 143 Ill. 2d at 519. If a bona fide doubt of the

defendant's fitness is raised, the trial court has a duty to hold

a fitness hearing before proceeding further. 725 ILCS 5/104--11(a)

(West 1992); Brandon, 162 Ill. 2d at 456. The trial court's ruling

on the issue of fitness will be reversed only if it is against the

manifest weight of the evidence. People v. Mahaffey, 166 Ill. 2d 1,

18 (1995).

     At the fitness hearing in this case, defense counsel agreed

that there was no dispute that the defendant understood the nature

and purpose of the proceedings against him. Rather, the dispute

centered on the second part of the fitness inquiry, whether the

defendant had the capacity to assist in his defense. 725 ILCS

5/104--10 (West 1992). The testimony at the fitness hearing is

summarized below.

     Dr. Mathew Markos, a licensed forensic psychiatrist and acting

clinical director of the Psychiatric Institute of the Circuit Court

of Cook County (Psychiatric Institute), testified for the State.

Dr. Markos testified that he had previously conducted examinations

to determine fitness for trial or sanity thousands of times. Dr.

Markos met with the defendant, pursuant to court orders, on four

occasions between August 27, 1993, and February 15, 1994. Dr.

Markos testified that, during his meetings with the defendant, the

defendant was calm and cooperative, exhibiting good eye contact and

no anxiety. Dr. Markos specifically looked for looseness of

association and delusions on the part of the defendant, but saw no

evidence of such symptoms. Dr. Markos discussed the defendant's

"philosophy" with him and determined that his beliefs regarding

Aryan supremacy did not constitute a delusion in the psychiatric

sense. Rather, the defendant's philosophy, Dr. Markos determined,

was a highly personalized idiosyncratic belief.

     Dr. Markos diagnosed the defendant as suffering from a

personality disorder with schizoid, narcissistic and paranoid

traits, which does not constitute a mental illness or mental

disorder. Using the criteria set forth in the Diagnostic and

Statistical Manual of Mental Disorders (Third Edition-Revised)

(DSMIII-R), Dr. Markos concluded that the defendant was not

suffering from schizophrenia. The DSMIII-R requires that, for a

diagnosis of schizophrenia, there must be the presence of at least

two symptoms, and one of those must be a prominent delusion. The

defendant exhibited no delusions or delusional thinking. Neither

did the defendant exhibit other symptoms of schizophrenia, such as

hallucinations, catatonia or incoherence.

     Dr. Markos further testified that, according to his medical

records, the defendant had been treated with various antipsychotic

drugs while in custody. There was, however, no change in the

defendant's beliefs as a result of the medications. According to

Dr. Markos, a true psychiatric delusion would be amenable to

treatment with medications. Dr. Markos conceded that drugs will not

always cure a delusional disorder.

     Dr. Markos acknowledged that Drs. Fauteck and Rabin, also of

the Psychiatric Institute, had diagnosed the defendant as

schizophrenic. Dr. Markos took these opinions into account in

reaching his own diagnosis. Dr. Markos also acknowledged that other

doctors had diagnosed the defendant as suffering from delusional

disorder. Dr. Markos testified that the symptoms described by those

doctors did not support a diagnosis of delusional disorder, without

the additional symptom of a psychiatric delusion. Dr. Markos never

personally observed any of the symptoms described in the records of

those other doctors.

     Based upon all of this information, Dr. Markos found the

defendant fit to stand trial. In Dr. Markos' opinion, the defendant

understood the charges against him and had the capacity to

cooperate with counsel if he so chose. The defendant had simply

chosen not to cooperate with counsel and had very clearly

articulated that he wished to represent himself.

     The defendant's first witness at the fitness hearing was

Assistant Public Defender Thomas Verdun. Verdun was assigned to

represent the defendant at his August 9, 1993, bond hearing. Verdun

interviewed the defendant for 20 to 30 minutes, during which time

the defendant never looked directly at him. While in court at that

hearing, the defendant interrupted the judge in order to make a

statement condemning "fake Aryan beauty." The defendant also stated

to the court that he was disgusted by the ugliness of people and

that he was honored to give his life for his cause. The judge

conducting the bond hearing ordered that the defendant undergo a

behavioral clinical examination at the Psychiatric Institute.

     Dr. Satinder Brar, a clinical psychologist and coordinator of

the residential treatment unit of Cook County jail, also testified

for the defendant. Dr. Brar had diagnosed the defendant with

delusional disorder, grandiose type, which is a mental illness. Dr.

Brar determined that the defendant was not willing to cooperate

with counsel in his defense because his delusional system was so

precious to him that he must protect it.

     The defense also called Dr. Paul Fauteck, a forensic

psychologist at the Psychiatric Institute. Pursuant to court

orders, Dr. Fauteck examined the defendant four times between

August 19, 1993, and February 15, 1994, administering psychological

tests on two occasions. At the first examination, the defendant

seemed very intense, maintaining unbroken eye contact, but was

overall appropriately behaved. The defendant described to Dr.

Fauteck his philosophy, stating that he was alarmed at the

increasing ugliness of the American population and believed that it

was due to "false Aryan cosmetics," specifically plastic surgery,

hair coloring and tinted contact lenses. The defendant reported

that he believed that the Anti-Defamation League was tracking him

and had labelled him a "very dangerous man." After the first

examination, Dr. Fauteck diagnosed the defendant as suffering from

delusional disorder, persecutory type.

     During the second examination, Dr. Fauteck administered

several psychological tests, the Minnesota Multiphasic Personality

Inventory (Second) (MMPI-2), the Rorschach Ink Blot Test and the

Thematic Apperception Test, to the defendant. After analyzing the

test results, Dr. Fauteck diagnosed the defendant as schizophrenic,

paranoid type, which is a mental illness. In reaching this

diagnosis, Dr. Fauteck also relied on a social history provided by

the defendant's parents, showing a history of apparent

schizophrenia in the family, the defendant's statements and

behavior, and the defendant's medical records while incarcerated.

Dr. Fauteck also noted that the defendant exhibited marked

looseness of association, in that he did not have an internal

consistency in his delusions, and that he had reported experiencing

auditory hallucinations in 1983 while mildly intoxicated. Dr.

Fauteck further testified that it is not uncommon for a psychosis

to be intractable and nonresponsive to medications.

     In Dr. Fauteck's opinion, the defendant was not fit to stand

trial. Dr. Fauteck found that the defendant understood the charges

against him, but that his mental illness rendered him incapable of

assisting in his defense. Dr. Fauteck explained that, for the

defendant, the virtual survival of civilization depends on him and

on his sacrificing his life to make a statement. In Dr. Fauteck's

opinion, because of his delusion, the defendant could not view the

trial process as a defendant should view it and could not make

rational decisions about his defense.

     On cross-examination, Dr. Fauteck testified that the defendant

was very bright and articulate. Dr. Fauteck admitted that, after

his first examination of the defendant, his provisional opinion was

that the defendant was fit. Dr. Fauteck acknowledged that the

criteria in the DSMIII-R for diagnosing schizophrenia are used

almost universally in his profession. Dr. Fauteck also acknowledged

that, under the DSMIII-R, more than just a delusion is necessary

for a diagnosis of schizophrenia. Dr. Fauteck further conceded that

a diagnosis of schizophrenia does not by itself render a person

unfit for trial.

     Dr. Michael Rabin, a forensic psychologist at the Psychiatric

Institute, also testified for the defense. Dr. Rabin had

particularized training in the scoring of the MMPI and Dr. Fauteck

asked him to analyze the defendant's test. Dr. Rabin also sat in on

Dr. Fauteck's interviews with the defendant on two occasions. The

defendant stated during these interviews that he expects to use the

trial as a forum to warn America about the danger posed by fake

Aryan cosmetics and that he did not want a lawyer to represent him

because his ideas were so unique that only he could fully explain

them. Dr. Rabin diagnosed the defendant as a paranoid

schizophrenic. In Dr. Rabin's opinion, the defendant was unable to

cooperate with counsel due to his delusional beliefs and was

therefore unfit for trial. Dr. Rabin agreed, however, that a

diagnosis of schizophrenia does not necessarily mean that a person

is unfit.

     In addition, psychiatrists Drs. Rafael Carreira and Usha

Kartan testified for the defense. While both had diagnosed the

defendant as suffering from delusional disorder, neither offered an

opinion on the defendant's fitness.

     After hearing all of the evidence, the trial court ruled that

the defendant had the ability to assist in his defense and was

therefore fit to stand trial. This ruling was not against the

manifest weight of the evidence. Dr. Markos' testimony provided

adequate support for the trial court's finding that the defendant

was fit. The only dispute was whether the defendant was capable of

assisting in his defense. Dr. Markos, whose qualifications as an

expert in this regard were unchallenged, testified that the

defendant was capable of assisting in his defense and was therefore

fit to stand trial. Dr. Markos' opinion was based on repeated

examinations of the defendant and took into consideration all

relevant information, including the contrary opinions of his

colleagues. While the defendant presented other expert witnesses

who testified to a contrary opinion, the trial court was not

required to accept the defense experts' view. The credibility and

weight to be given to psychiatric testimony are for the trier of

fact to determine. Mahaffey, 166 Ill. 2d at 18; People v. Bilyew,

73 Ill. 2d 294, 302 (1978). As this court has previously stated,

"[t]he ultimate issue was for the trial court, not the experts, to

decide." Bilyew, 73 Ill. 2d at 302.

     Moreover, the opinions of the defense experts who found the

defendant unfit were based on the finding that the defendant's

beliefs regarding the Aryan race constituted a psychiatric

delusion. Dr. Markos disagreed with the finding that the

defendant's beliefs were delusional. The trial court was thus

called upon to make a credibility determination and decide between

the two opposing views expressed by Dr. Markos and by the defense

experts. The judge's decision to accept the conclusion of Dr.

Markos and reject that of the defense experts was not manifestly in

error. The ruling that the defendant was fit to stand trial was

therefore not against the manifest weight of the evidence.

                  B. Trial Court's Reference to Delusions

     In a further attempt to obtain reversal of the fitness

finding, the defendant charges that the trial court's ruling cannot

be upheld because the trial court made a factual finding which

compelled the opposite conclusion. The defendant refers to the

following statement by the trial court, made while delivering its

ruling on fitness:

          "The fact that an individual has deep-seated, delusional

          beliefs which are fixed and which do not change in the

          light of more reasoned beliefs does not lift such

          feelings to the level of being unable, and I underscore

          unable, to assist counsel who may not hold or agree with

          such delusional thought."

The defendant asserts this statement reveals that the trial court

found the defendant's beliefs were delusional. The defendant

contends all of the expert witnesses testified that, if the

defendant's beliefs were delusional, he was not fit to stand trial.

Accordingly, the defendant concludes, this factual finding by the

trial court required the court to rule that the defendant was

unfit.

     The defendant's argument fails. When the trial judge's comment

is considered in context, it is clear that he had accepted Dr.

Markos' testimony that the defendant's belief system did not

preclude him from cooperating with counsel. The trial court stated

that he found the defendant fit because, he determined, the

defendant was capable of assisting in his defense. The judge's use

of the term "delusional" does not render his ultimate conclusion

erroneous. Viewed in context, it is apparent that the judge was

using the term in a lay or nontechnical sense and was not

demonstrating agreement with the opinion of the defense experts.

See People v. Scott, 148 Ill. 2d 479, 507-08 (1992) (fitness

finding upheld despite trial court's comment that the defendant was

"unable to cooperate with his own counsel," where it was clear that

the court found that the defendant was simply unwilling, not

unable, to cooperate and the evidence supported that finding).

                         C. Prejudgment of Fitness

     The defendant next contends that a comment by the trial judge

revealed that he had prejudged the fitness issue. The record does

not support this contention.

     As discussed earlier in this opinion, prior to the start of

the fitness hearing, an issue was raised concerning the defendant's

desire to waive a jury for the proceeding. In connection with this

issue, the trial court asked the parties for a synopsis of the

evidence which would be presented at the fitness hearing. Defense

counsel stated that doctors were expected to testify that the

defendant was schizophrenic, and argued that this would render the

defendant incompetent to waive a jury for fitness. The trial court

responded with the following comment:

          "Well I do because I do not think that a paranoid

          schizophrenic--By nature of that disease, I do not think

          you are going to find anything that says that they are

          impaired because of the disease, if they are actively

          suffering from that disease, in making decisions. Their

          decisions may be bad, but it does not say anything--."

     The defendant contends that these remarks reveal that the

trial court had prejudged the issue of the defendant's fitness. We

disagree. It is clear from the context of these remarks that the

trial judge was not prejudging fitness, but was simply addressing

defense counsel's claim that the defendant was not competent to

waive a jury for the fitness hearing.

                   D. Reliance on Presumption of Fitness

     The defendant finally asserts that the trial court improperly

relied on the statutory presumption of fitness in finding the

defendant fit. For this contention, the defendant relies on the

following comment by the trial court in delivering its ruling:

          "It is, therefore, the finding of this Court that the

          State has borne its burden by a preponderance of the

          evidence as to fitness and that the legal presumption of

          fitness has not been overborne and that the defendant is

          adjudged to be legally fit to stand trial."

     The defendant correctly asserts that, once the trial court

finds that a bona fide doubt of fitness exists, the presumption of

fitness no longer adheres and the burden shifts to the State to

prove the defendant's fitness. 725 ILCS 5/104--11(c) (West 1992);

People v. Yonder, 44 Ill. 2d 376, 383-84 (1969); People v. Brown,

252 Ill. App. 3d 377, 383 (1993). The defendant contends the above

comment demonstrates that the trial court improperly required the

defendant to overcome a presumption of fitness and thereby diluted

the State's burden of proof. The defendant's argument is

groundless. The trial court's comments as a whole indicate that it

properly allocated the burden of proving fitness to the State and

did not, as the defendant suggests, require the defendant to

overcome a presumption of fitness. The trial court repeatedly

stated the correct burden of proof in making its ruling. The

incidental reference to the presumption of fitness does not support

a finding that the court improperly allocated the burden of proof.

See Yonder, 44 Ill. 2d at 384 (harmless for trial court to instruct

jury both that there was a presumption of competency and that the

State had the burden of proving competency); People v. Coulter, 230

Ill. App. 3d 209, 217 (1992).

                                   Trial

                             Waiver of Counsel

     The defendant asserts that reversal of his convictions is

warranted because his waiver of counsel was accepted without

compliance with Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)).

We find the defendant's waiver of counsel was valid.

     It is well established that the sixth amendment to the United

States Constitution guarantees an accused in a criminal proceeding

both the right to the assistance of counsel and the correlative

right to proceed without counsel. Faretta v. California, 422 U.S.

806, 833-34, 45 L. Ed. 2d 562, 580-81, 95 S. Ct. 2525, 2540 (1975);

People v. Lego, 168 Ill. 2d 561, 564 (1995); People v. Silagy, 101

Ill. 2d 147, 179 (1984). The right of self-representation is "as

basic and fundamental as [the] right to be represented by counsel."

People v. Nelson, 47 Ill. 2d 570, 574 (1971). Accordingly, an

accused may waive his constitutional right to counsel as long as

the waiver is voluntary, knowing and intelligent. Faretta, 422 U.S.

at 835, 45 L. Ed. 2d at 581, 95 S. Ct. at 2541; Lego, 168 Ill. 2d

at 564. Although a court may consider the decision unwise, a

defendant's knowing and intelligent election to represent himself

must be honored out of " `that respect for the individual which is

the lifeblood of the law.' " Silagy, 101 Ill. 2d at 180, quoting

Illinois v. Allen, 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363, 90

S. Ct. 1057, 1064 (1970) (Brennan, J., concurring).

     Supreme Court Rule 401(a) governs the trial court's acceptance

of an accused's waiver of counsel. Pursuant to Rule 401(a), certain

admonishments must be given by the trial court before a defendant

may be found to have knowingly and intelligently waived counsel.

Rule 401(a) provides as follows:

               "(a) Waiver of Counsel. Any waiver of counsel shall

          be in open court. The court shall not permit a waiver of

          counsel by a person accused of an offense punishable by

          imprisonment without first, by addressing the defendant

          personally in open court, informing him of and

          determining that he understands the following:

                    (1) the nature of the charge;

                    (2) the minimum and maximum sentence

               prescribed by law, including, when applicable, the

               penalty to which the defendant may be subjected

               because of prior convictions or consecutive

               sentences; and

                    (3) that he has a right to counsel and, if he

               is indigent, to have counsel appointed for him by

               the court." 134 Ill. 2d R. 401(a).

     This court has held that compliance with Rule 401(a) is

required for an effective waiver of counsel. People v. Baker, 94

Ill. 2d 129, 137 (1983). Strict, technical compliance with Rule

401(a), however, is not always required. Rather, substantial

compliance will be sufficient to effectuate a valid waiver if the

record indicates that the waiver was made knowingly and

voluntarily, and the admonishment the defendant received did not

prejudice his rights. People v. Coleman, 129 Ill. 2d 321, 333

(1989); People v. Johnson, 119 Ill. 2d 119, 132 (1987).

     In this case, the record reveals that the defendant's waiver

of counsel was preceded by substantial compliance with Rule 401(a).

The defendant first expressed his desire to "speak on [his] own

behalf" at his bond hearing on August 9, 1993. Although it is not

entirely clear, the judge presiding over that hearing appears to

have allowed the defendant to represent himself for the purposes of

that hearing, with an assistant public defender acting in a standby

capacity. Subsequently, however, at the defendant's arraignment,

the public defender's office entered an appearance on his behalf

and acted as his representative at that hearing.

     On October 13, 1993, the defendant, still represented by

assistant public defenders, appeared before circuit court Judge

Locallo. At that time, the defendant indicated that he did not want

an attorney to represent him. Judge Locallo responded that before

the defendant would be allowed to represent himself, the court

would have to be satisfied that he was competent to do so.

Accordingly, Judge Locallo stated, he would order the defendant

examined for fitness. The defendant, still represented by assistant

public defenders, again appeared before Judge Locallo on November

19, 1993. As of that date, a report had been issued by Dr. Mathew

Markos stating that the defendant was fit to stand trial. Judge

Locallo inquired of the defendant about his desire to represent

himself. The defendant stated, "At the moment I will retain my

counsel."

     On December 14, 1993, the defendant again appeared before

Judge Locallo. At that time, Judge Locallo raised the issue of

defendant's self-representation. The following colloquy ensued:

               "THE COURT: Mr. Haynes, you have appeared before me

          a number of times. Initially if I recall correctly from

          one of the first times that you came before me you had

          indicated that you wished to represent yourself, but then

          at the same time also have standby counsel.

               [DEFENSE COUNSEL]: I am sorry. I didn't realize you

          were going to address this at this point. If it's your

          intention, if it's your Honor's intention to address the

          matter of Mr. Haynes' representation, we're going to

          interpose an objection at this point.

               THE COURT: Before you propose your objection.

          Obviously you are working hard on this case with co-

          counsel, and the State is working hard on this case, too,

          to get ready for trial. The Court is getting mixed

          signals from Mr. Haynes as to whether he is going to

          represent himself or whether he is going to have you as

          counsel. The Court is not going to require Mr. Haynes to

          make that decision today. But I feel that it is incumbent

          since this case is in the system that he should be

          admonished regarding the consequences of representing

          himself. *** So I am not going to make Mr. Haynes make

          his decision, but I feel it is incumbent that he

          understands the consequences. And he will be given some

          additional time to make a decision as to what he wishes

          to do. But I am not going to allow this case to go too

          much longer because at some point the State has to know

          who they are going to be dealing with."

     Defense counsel objected, asserting that it was inappropriate

to address the issue of the defendant's representation before the

fitness issue had been resolved. Judge Locallo, however, stated

that he believed it was appropriate to admonish the defendant

pursuant to Supreme Court Rule 401. The judge proceeded to clarify

the defendant's position on the issue:

               "THE COURT: All right. Mr. Haynes you had previously

          stated to me before that you wanted to represent

          yourself. But then wanted standby counsel. And then on

          another court date you said you wanted to retain the

          attorneys that are representing you today. Then on

          December 6th you had again indicated you wished to

          represent yourself. Is that a fair assessment of what you

          had stated before?

               THE DEFENDANT: Yes. It's a fair assessment."

     Thereafter, Judge Locallo described to the defendant each of

the three counts of first degree murder and the one count of

burglary with which he was charged. The judge further informed the

defendant of the minimum and maximum penalties for first degree

murder, including the possibility of an extended term sentence and

the death penalty. Judge Locallo informed the defendant that he had

the right to be represented by counsel and that, if he could not

afford an attorney, one would be appointed for him. The judge also

described the functions a lawyer would undertake on the defendant's

behalf. The defendant stated that he understood the judge's

admonishments. Judge Locallo also inquired into the defendant's

personal history, determining that the defendant was 35 years old,

possessed a bachelor's degree in chemistry and had previously

appeared in court. Judge Locallo concluded by informing the

defendant that, if no further fitness exams were subsequently

requested, "then the issue as to who is going to represent you will

again be addressed."

     Following this court appearance, subsequent fitness

examinations were conducted, leading up to a fitness hearing which

took place between March 2 and 4, 1994. On March 4, 1994,

immediately following the trial court's ruling that the defendant

was fit to stand trial, the defendant orally informed the court he

would "like to make a move to be my own counsel and be my own

representative." The trial judge, Judge Strayhorn, responded as

follows:

               "THE COURT: You have that right. Mr. Haynes, I will

          grant that right, but I will order Mr. Sarley and Miss

          Marchigiani [assistant public defenders] to stand by and

          offer you such assistance as you ask them to offer in the

          trial process.

               Therefore, defendant's request to represent himself

          is allowed. Public defender is appointed as standby

          counsel.

               I will set the trial date then.

               [DEFENSE COUNSEL]: We would ask for a hearing on

          whether Mr. Haynes can represent himself.

               THE COURT: No. If he wants to represent himself, I

          have advised him, other judges have advised him against

          the wisdom of representing oneself in a criminal case.

          The supreme court says that right cannot be taken away

          from an individual who wants to do so. Therefore, I am

          going to let him do so. You will stand by as standby

          counsel."

     Later in this same court appearance, one of the prosecutors

sought to obtain from the trial judge clarification of the judge's

position on the required admonitions, and the following colloquy

ensued:

               "[PROSECUTOR]: With respect to Supreme Court Rule

          401 regarding the admonishments required, Judge Locallo

          in our presence did advise the defendant of that.

               THE COURT: I know that.

               [PROSECUTOR]: I want to make sure that is of record

          and that is what you are relying on at this point. At

          that time Judge Locallo--

               THE COURT: It was done in open court in the presence

          of a court reporter. I have no reason to doubt that it

          wasn't done. I do not feel it necessary to repeat it. It

          has already been repeated many times to this man.

          Therefore, if he persists in his determination to

          represent himself, fine, so be it."

     On the first day of trial, April 25, 1994, Judge Strayhorn

inquired of the defendant whether he continued in his wish to

represent himself and warned him that it was unwise to proceed

without counsel. The defendant responded that he wished to

represent himself.

     On this record, we find that there was substantial compliance

with Rule 401(a). After the defendant had repeatedly expressed a

desire to represent himself, Judge Locallo admonished the defendant

at length regarding his right to counsel and the role defense

counsel would play in the proceedings, the nature of the murder and

burglary charges against him, and the fact that he could be

sentenced to a lengthy term of imprisonment or the death penalty.

The defendant stated that he understood each of these

admonishments. Judge Locallo also questioned the defendant

regarding his personal history to ensure that the defendant was

capable of understanding these matters. These efforts by Judge

Locallo constituted, at least, substantial compliance with Rule

401(a).

     The defendant nonetheless contends that Judge Locallo's

admonishments were insufficient to satisfy the requirements of Rule

401(a), for two reasons. First, the defendant argues that the

admonishments given by Judge Locallo were ineffective because they

were given on December 14, 1993, and the defendant did not actually

waive counsel until March 4, 1994. The defendant argues that

compliance with Rule 401(a) required that Judge Strayhorn, the

judge who accepted the waiver of counsel, give the defendant the

required admonishments at the time he accepted the waiver.

     We reject the defendant's contention. Under the specific

circumstances of this case, the admonishments given by Judge

Locallo were sufficient to comply with Rule 401(a). Judge Locallo's

admonishments, though given a number of weeks prior to the

defendant's waiver, were given at a time when the defendant had

indicated a desire to waive counsel. Moreover, Judge Locallo's

comments reveal that he specifically contemplated that the

defendant would not make a decision on the waiver issue

immediately, but would take time to consider the decision. Judge

Locallo stated that he was admonishing the defendant so that the

defendant could consider all the pertinent information while he

pondered his decision, which would be made at a later date.

Thereafter, at the earliest time the issue of the defendant's

representation could be revisited (after the defendant's fitness

was resolved), the defendant informed the court that he had made

the decision to waive counsel. Given these circumstances, we find

it reasonable to conclude that the defendant had fully considered

the admonishments given by Judge Locallo and was relying on those

admonishments when he made his decision to waive counsel.

     Further, it is clear that the trial judge, in accepting the

defendant's waiver of counsel, was aware that Judge Locallo had

admonished the defendant in accordance with Rule 401(a) and relied

on those admonishments to conclude that the waiver was knowing and

intelligent. The purpose of Rule 401(a) is to ensure that a waiver

of counsel is knowingly and intelligently made. People v. Stahr,

255 Ill. App. 3d 624, 627 (1994). Judge Strayhorn was aware of the

actions of Judge Locallo and thus had a sufficient basis for

concluding that the defendant knew and understood his rights and

had made a knowing and intelligent decision to waive counsel. The

purpose of Rule 401(a) therefore was not frustrated.

     It would have been preferable for the trial judge accepting

the waiver to admonish the defendant in accordance with Rule 401(a)

at the time he accepted the defendant's waiver of counsel. We

cannot hold, however, that the failure of a trial judge to admonish

a defendant contemporaneously with his waiver is always fatal to

the validity of a waiver of counsel. Rather, each case must be

assessed on its own particular facts. In some cases, circumstances

may dictate that a lapse in time between the giving of Rule 401(a)

admonishments and the defendant's waiver rendered the waiver

invalid. See, e.g., People v. Langley, 226 Ill. App. 3d 742, 749-50

(1992) (waiver held invalid because only admonishments had been

given at the defendant's arraignment seven months earlier, at a

time when the defendant was not requesting to waive counsel). Given

the circumstances present in this case, we find that the lapse of

time between the admonishments and the waiver did not negate the

effectiveness of the admonishments.

     The defendant also charges that, aside from timing, Judge

Locallo's admonishments were insufficient to satisfy Rule 401(a)

because Judge Locallo neglected to include the minimum and maximum

sentences possible for the burglary charge. We find that this

omission did not invalidate the defendant's waiver of counsel. As

noted, this court has held that substantial compliance with Rule

401(a) is sufficient where the record shows that the waiver was

knowingly and intelligently made. Coleman, 129 Ill. 2d at 333;

Johnson, 119 Ill. 2d at 132. In Coleman, the trial court had

incorrectly admonished the defendant that the minimum sentence

possible if he was convicted of murder was 20 years' imprisonment

when, in fact, the minimum sentence possible was natural life

imprisonment. This court held that the trial court had

substantially complied with Rule 401(a) in that it had informed the

defendant of his right to counsel, described the nature of the

charges and explained that the death penalty was a possible

sentence. This court concluded that the defendant's waiver of

counsel was valid, reasoning that:

          "Where a defendant knows the nature of the charges

          against him and understands that as a result of those

          charges he may receive the death penalty, his knowledge

          and understanding that he may be eligible to receive a

          lesser sentence pales in comparison." Coleman, 129 Ill.

          2d at 333-34.

Likewise, in Johnson, this court held a waiver of counsel to be

valid despite the fact that the trial court had failed to

specifically advise the defendant that he faced a mandatory minimum

sentence of life imprisonment. This court relied upon the fact that

the defendant had been fully apprised that he could receive the

death penalty. Johnson, 119 Ill. 2d at 132-34.

     In this case, as in Coleman and Johnson, the information

omitted from the admonishments did not invalidate the defendant's

waiver of counsel. Here, as in those cases, the defendant was fully

aware of the range of sentences possible for the most serious

charge against him, first degree murder, including the possibility

of the death sentence. Given that, the importance of the

defendant's having specific knowledge of the minimum and maximum

sentences for the significantly less serious charge of burglary

clearly "pales in comparison." Coleman, 129 Ill. 2d at 334.

Accordingly, we hold that Judge Locallo's admonishments, despite

the omission of the sentences for burglary, substantially complied

with Rule 401(a).

     In addition, the record as a whole clearly demonstrates that

the defendant's decision to waive counsel was made freely,

knowingly and intelligently. The defendant first expressed his

desire to represent himself at the outset of the proceedings

against him, and reiterated that desire in open court on several

other occasions. Further, several examining doctors at the fitness

hearing testified that, during their meetings with the defendant,

he was adamant in his desire to represent himself. Consequently,

there can be no doubt as to the defendant's choice on the

representation issue. In addition, testimony at the fitness hearing

revealed that the defendant expressed an understanding of the

nature of the charges against him, the role an attorney would play,

and the fact that the death penalty was a possible sentence. With

regard to his right to appointed counsel, the defendant was

repeatedly advised of that right and, in fact, received the

assistance of appointed counsel for a period of time prior to

trial. It is therefore evident that the defendant understood that

he was entitled to legal representation, free of charge if

required.

     All of these circumstances, combined with the detailed

admonishments of Judge Locallo, compel the conclusion that the

defendant knew and understood the nature of the charges against

him, the sentencing possibilities, and his right to counsel, all of

the matters encompassed by Rule 401(a). The defendant's waiver of

counsel was valid and reversal of his convictions on this ground is

not warranted.

     In a related claim, the defendant charges that his waiver of

counsel was invalid because his reason for the waiver was

irrational, pointing to the testimony at the fitness hearing that

the defendant planned to use the trial to broadcast his philosophy.

We do not agree that the defendant's waiver may be invalidated on

such a basis. We have found that the defendant's waiver was made

knowingly and intelligently, and in substantial compliance with the

mandates of Rule 401. We decline to require that a trial court,

having determined that a defendant's waiver was knowing and

intelligent, must make the further inquiry into whether the

defendant has a proper reason for making the waiver. To the

contrary, a court must honor a defendant's knowing and intelligent

election to proceed pro se, even if the court considers the

decision unwise. Silagy, 101 Ill. 2d at 179-80.

     Alternatively, the defendant claims that the trial court erred

in failing to readmonish him regarding his waiver of counsel prior

to the sentencing hearing. This court has held that, in the absence

of circumstances indicating that the waiver is limited, a valid

pretrial waiver of counsel by a defendant who is advised that he

has the right to counsel at all stages of the proceedings is

operative at sentencing. People v. Johnson, 119 Ill. 2d 119, 145-47

(1987); People v. Baker, 92 Ill. 2d 85, 95 (1982). We find no

indication in the record that the defendant's pretrial waiver of

counsel was limited to trial only. Further, we note that, prior to

the sentencing hearing, the trial court inquired of the defendant

whether he persisted in his desire to represent himself and advised

him against proceeding pro se. The defendant informed the trial

court that he wished to continue representing himself.

Readmonishment of the defendant prior to sentencing was not

required.

                           Other-Crimes Evidence

     The defendant also charges that he was denied a fair trial by

the introduction of irrelevant and inflammatory evidence of other

crimes he committed. During trial, the State introduced evidence

demonstrating that the defendant had attempted to murder Charles

Stroupe and had murdered Frank Ringi. The defendant contends that

this evidence was irrelevant and its introduction requires a new

trial. We find no grounds for reversal.

     The defendant raised no objection to the admission of any of

the challenged evidence. Consequently, the defendant waived any

error in the admission of this evidence. People v. Enoch, 122 Ill.

2d 176, 186 (1988). Moreover, even if error occurred in the

introduction of this evidence, we would be compelled to find that

the error was harmless beyond a reasonable doubt. See People v.

Williams, 164 Ill. 2d 1, 24 (1994). The properly admitted evidence

demonstrating the defendant's guilt of the murder of Dr. Sullivan

was nothing short of overwhelming. Not only did the defendant

confess to the murder to police, the defendant also repeatedly

confessed to the murder in open court during the trial. In

addition, several eyewitnesses identified the defendant as the

perpetrator of this crime, and the murder weapon and other

incriminating evidence were found in the defendant's apartment.

Under these circumstances, any error in the admission of the

complained-of evidence was harmless.

     For the foregoing reasons, we reject the defendant's claims

that he is entitled to a new trial. The defendant has raised the

point, and the State agrees, that it was error for the trial court

to enter judgment on three counts of murder, where there was only

one victim. Accordingly, the conviction for felony murder and the

conviction for knowing murder are vacated. People v. Pitsonbarger,

142 Ill. 2d 353, 377 (1990) (when multiple murder convictions have

been entered for the same act, the less culpable convictions must

be vacated). The defendant's convictions for intentional murder and

burglary are affirmed.

                                Sentencing

                         Eligibility Determination

     The defendant's first claim of error with regard to sentencing

is directed at the trial court's finding that he was eligible for

the death penalty. As noted, the defendant was found eligible based

on two statutory eligibility factors: (1) that the defendant

intentionally killed Dr. Sullivan in the course of committing a

burglary (720 ILCS 5/9--1(b)(6) (West 1992)), and (2) that the

defendant committed the murder in a cold, calculated and

premeditated manner pursuant to a preconceived plan (720 ILCS 5/9--

1(b)(11) (West 1992)).

     The defendant does not challenge the sufficiency of the

evidence to support a finding of death eligibility. Rather, the

defendant contends that the eligibility finding must be reversed

because it was made summarily by the trial court without a hearing

on the issue. The record supports the defendant's factual

assertions in this regard. According to the record, immediately

after the trial court issued its guilty verdict at trial, the court

went on to find the defendant eligible for the death penalty

without hearing any additional evidence or argument. Later in the

proceeding, the State informed the court that it was prepared to

proceed with the eligibility hearing and the trial judge responded

that he would not hold such a hearing because he had already found

the defendant eligible. The State subsequently requested that the

trial court inquire of the defendant whether he wished to present

any evidence on eligibility. The trial court refused, stating:

               "THE COURT: No. Doesn't need to be. I found as a

          matter of law that he is eligible. So, whatever he says

          is not going to have any consequence because the law says

          he's eligible."

     After reviewing these comments and others made by the trial

court, we conclude that the trial court did, as the defendant here

claims, dispense with a hearing on eligibility and make a summary

finding of eligibility. This conduct by the trial court was clearly

in violation of our death penalty statute. The death penalty

statute expressly requires that a separate sentencing hearing be

conducted for the dual purposes of "determin[ing] the existence of

factors set forth in subsection (b) [eligibility factors]" and

"consider[ing] any aggravating or mitigating factors." 720 ILCS

5/9--1(d) (West 1992); People v. Brown, 169 Ill. 2d 132, 155-56

(1996). The statute provides that, at the sentencing hearing, "any

information relevant to any of the factors set forth in subsection

(b) [eligibility factors] may be presented by either the State or

the defendant under the rules governing the admission of evidence

at criminal trials," and "[t]he State and the defendant shall be

given fair opportunity to rebut any information received at the

hearing." 720 ILCS 5/9--1(e) (West 1992). The trial court thus

clearly erred in making the eligibility determination without

providing the defendant the opportunity, at a separate sentencing

hearing, to offer evidence on the issue and rebut that of the

State.

     Our review of the record further reveals, however, that at no

time prior to or during the sentencing proceedings did the

defendant demand a hearing on eligibility, request that he be

permitted to present evidence on the issue, or otherwise object to

the trial court's handling of the issue. Thus, we are compelled to

find that the defendant acquiesced in the summary procedure

employed by the trial court, and thereby waived this claim of error

for review. People v. Enoch, 122 Ill. 2d 176, 186 (1988). The fact

that the defendant was proceeding pro se does not excuse his

failure to preserve an error for review. People v. Long, 39 Ill. 2d

40, 43 (1968). This is particularly true here, where the defendant

was provided with standby counsel who were available to assist him.

Long, 39 Ill. 2d at 43. Moreover, the defendant has not

demonstrated that he was prejudiced by the trial court's actions.

As discussed later in this opinion, the evidence supporting the

defendant's eligibility, at least under the factor set forth in

section 9--1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9--

1(b)(11) (West 1992)), was nothing short of overwhelming. Moreover,

the circumstances of this case are unique, in terms of the

potential for prejudice to the defendant.  We cannot view this

error in a vacuum; rather, we must look at the record as a whole to

determine if reversal is required.  The defendant represented

himself throughout the trial and sentencing proceedings.  In the

course of that representation, the defendant chose to present no

evidence to challenge either his guilt or the death penalty, save

for his own inflammatory comments in which he admitted his guilt

and espoused his racist philosophy. The evidence at trial, in

particular the defendant's own detailed confessions, overwhelmingly

established the defendant's guilt of the charged crimes, and also

overwhelmingly established his eligibility for the death penalty. 

The same judge who acted as the fact finder at the defendant's

trial took into account all of this evidence and found that the

defendant was eligible for the death penalty.  A hearing on

aggravation and mitigation was held, at which hearing the defendant

had every opportunity to present evidence or argument in opposition

to a death sentence.  The defendant presented no evidence other

than his own brief statement in which he again condemned fake Aryan

cosmetics.  After the aggravation-mitigation hearing, the trial

judge reiterated the eligibility finding in his sentencing order. 

In addition, as noted above, the defendant made no objection to the

manner in which the eligibility finding was made.  The dissent

speculates that the defendant's failure to object should be excused

because objection would have been futile.  If speculation is to be

considered, however, it may also be speculated that the defendant's

lack of objection was simply consistent with his strategy

throughout the proceedings.  The defendant does not now suggest

what argument or evidence could have been presented in opposition

to eligibility. Thus, we find no circumstances which require

reversal of the defendant's sentence in this case, particularly in

light of the defendant's waiver.  We note that this court recently

held that reversal of a defendant's death sentence was not

warranted where defense counsel failed to mount any challenge to

the defendant's eligibility, because the evidence supporting the

defendant's eligibility was overwhelming. People v. Shatner, No.

76406 (September 19, 1996).

     We emphasize, however, that we do not condone the procedure

employed here of summarily deciding a defendant's eligibility for

the death penalty. The evidence presented at a defendant's

culpability trial is properly considered in making the eligibility

determination. However, a trial court may not simply combine the

eligibility determination with the culpability trial. Not only does

the statute provide otherwise, fairness militates against such a

procedure. The issues to be decided at the culpability trial differ

from those to be decided for death eligibility. Not all those

convicted of murder may be found eligible for the death penalty,

and the requirement of a statutory eligibility factor fulfills the

constitutional requirement of " `narrow[ing] the class of persons

eligible for the death penalty and *** reasonably justify[ing] the

imposition of a more severe sentence on the defendant compared to

others found guilty of murder.' " People v. Hope, 168 Ill. 2d 1, 36

(1995), quoting Zant v. Stephens, 462 U.S. 862, 877, 77 L. Ed. 2d

235, 249-50, 103 S. Ct. 2733, 2742 (1983). The culpability trial

focuses only on whether the defendant is guilty of murder, not on

the further consideration of whether he is also eligible for the

death penalty. Under this scheme, a defendant cannot be expected to

defend against both a guilty verdict and a finding of eligibility

at the culpability trial.

     The dissent strenuously urges that reversal of the defendant's

sentence is warranted on this ground.  The basis for the dissent's

belief that this error requires reversal in this case is less than

clear.  The bulk of the dissent's argument sets forth reasons why

the trial court's actions were in error.  As we have stated, we are

in agreement with the dissent that the requirements of the death

penalty statute were violated when the trial court summarily

determined eligibility.  We, along with the dissent, strongly

condemn the trial court's actions in failing to adhere to the

mandated statutory procedures.  The dissent would hold that

reversal of the defendant's sentence is required as a result of

this error.  Notably lacking in the dissent, however, is any

explanation of how, given the unique circumstances in this case,

the defendant was prejudiced by the trial court's actions.  Our

holding here is predicated on the unique facts of this case, and we

do not suggest that the procedure employed would not result in

reversal in another case. 

     Parenthetically, we are compelled to point out that the

dissent, in discussing People v. Brown, 169 Ill. 2d 132 (1996),

misstates the holding of that case.  The dissent states that in

Brown, this court reversed a death sentence on the ground that the

trial court committed error in immediately proceeding to determine

eligibility after finding the defendant guilty. Brown, however, did

not even address the propriety of the trial judge's actions in this

regard, let alone order reversal on that ground.  Rather, reversal

of the defendant's death sentence in Brown was predicated wholly on

the fact that the defendant's pretrial waiver of a jury for death

sentencing was invalid because the trial judge, in obtaining the

waiver, misinformed the defendant that he must waive a jury for

sentencing as a precondition to waiving a jury for trial. Brown,

169 Ill. 2d at 154-161.  No similar facts are present here, and the

dissent's suggestion that Brown compels reversal in this case is

not accurate.

     In a related contention, the defendant argues that reversal is

required because the trial court's summary finding of eligibility

indicated that the trial court was predisposed to impose the death

penalty. We fail to see, however, how a determination of

eligibility, which must be made in every case before the death

penalty may be imposed, indicates a "predisposition" to impose a

death sentence.

                         Jury Waiver at Sentencing

     The defendant waived a jury for his capital sentencing

hearing. The defendant now claims that his waiver was not knowing

and intelligent because the trial court failed to inform him that

the vote of one juror could preclude a sentence of death. This

claim is without merit. We have repeatedly held that a valid

capital sentencing jury waiver does not require the trial court to

admonish the defendant that the vote of a single juror is

sufficient to preclude imposition of the death penalty. People v.

Todd, 154 Ill. 2d 57, 72 (1992); People v. Erickson, 117 Ill. 2d

271, 295 (1987). This court has held it is sufficient, for a valid

capital sentencing jury waiver, for the trial court to explain to

the defendant that he is waiving the right to have a jury consider

the capital sentencing issues and that the sentencing decision

would, therefore, be made by the judge alone. People v. Brown, 169

Ill. 2d 132, 156 (1996); People v. Wiley, 165 Ill. 2d 259, 301

(1995). The record reveals that the trial court's admonishments to

the defendant prior to accepting the sentencing jury waiver met

these requirements. The defendant's contention that his sentencing

jury waiver was invalid is therefore rejected.

     The defendant also suggests that his jury waiver was invalid

because he was not specifically told by the trial court that he had

the right to a jury for the eligibility determination. As noted

above, however, we have found that the trial court's admonishments

to the defendant were sufficient to effectuate a valid sentencing

jury waiver. Further, our review of the record reveals that the

defendant clearly waived a jury for the entire sentencing

determination.

                Reevaluation of Fitness Prior to Sentencing

     The defendant next claims that reversal of his death sentence

is warranted because the trial court erred in rejecting standby

counsel's request for a reevaluation of the defendant's fitness

prior to sentencing. Shortly after the trial court issued its

verdict finding the defendant guilty, standby counsel for the

defendant asked the court to order the defendant examined for

fitness for sentencing. The trial court refused this request,

stating that the defendant had already been found fit.

     On appeal, the defendant acknowledges that he was found fit to

stand trial after a lengthy pretrial hearing. The defendant does

not claim that, subsequent to that hearing, a bona fide doubt of

his fitness was raised such that the trial court was required to

hold a fitness hearing prior to sentencing. 725 ILCS 5/104--11(a)

(West 1992). Rather, the defendant contends only that the trial

court should have ordered him examined for fitness at that time. We

disagree.

     The decision whether to order a fitness examination is

expressly left to the discretion of the trial court because it is

in a superior position to observe and evaluate the defendant's

conduct. 725 ILCS 5/104--11(b) (West 1992); People v. Hall, 186

Ill. App. 3d 123, 131-32 (1989). In this case, we find no abuse of

discretion in the trial court's denial of standby counsel's request

for appointment of an expert. The defendant had already been

extensively examined for fitness by several experts and the

findings of those experts were fully presented at the pretrial

fitness hearing. After hearing that testimony, the trial court

ruled that the defendant was fit, and we have found that this

ruling was supported by the evidence. In denying the request for

reevaluation, the trial court stated that it had observed nothing

during the course of the trial which indicated that the defendant's

status with regard to fitness had changed. The only new matter

pointed to by standby counsel as justification for ordering a new

fitness examination was the defendant's behavior of "rocking back

and forth" during the trial. This matter, however, was brought to

the attention of the trial judge, who indicated that he had noticed

the behavior, but that he did not find that it required a new

fitness examination. The trial judge was in the best position to

make this determination, having personally observed the defendant

over the course of these proceedings. We cannot find that the trial

court's denial of the request for reevaluation was an abuse of

discretion. See Hall, 186 Ill. App. 3d at 133-34; People v. Banks,

94 Ill. App. 3d 122, 129 (1981).

     The defendant also makes the vague assertion that a new

fitness examination was required because the trial court "knew"

that the defendant was receiving antipsychotic medications. This

assertion is groundless. The trial court's knowledge that the

defendant was receiving such medications was gained from the

testimony presented at the defendant's fitness hearing. Thus, the

trial court certainly took this information into account in making

the pretrial fitness determination. There is no evidence that the

administration of antipsychotic drugs to the defendant changed in

any manner that would have required a revisitation to the issue of

his fitness prior to sentencing.

                 Constitutionality of Section 9--1(b)(11)

     The defendant asserts that his death sentence must be vacated

because he was found eligible on the basis of an unconstitutionally

vague eligibility factor. As noted, the defendant was found

eligible for death on the basis of two eligibility factors: (1)

murder in the course of a felony (720 ILCS 5/9--1(b)(6) (West

1992)), and (2) murder committed in a cold, calculated and

premeditated manner pursuant to a preconceived plan (720 ILCS 5/9--

1(b)(11) (West 1992)). The defendant challenges the

constitutionality of section 9--1(b)(11), arguing that its terms do

not adequately narrow the class of those eligible for death. The

defendant's challenge fails.

     Section 9--1(b)(11) provides that a statutory eligibility

factor exists if:

               "the murder was committed in a cold, calculated and

          premeditated manner pursuant to a preconceived plan,

          scheme or design to take a human life by unlawful means,

          and the conduct of the defendant created a reasonable

          expectation that the death of a human being would result

          therefrom." 720 ILCS 5/9--1(b)(11) (West 1992).

This court has already held that section 9--1(b)(11) is not

unconstitutionally vague, finding that its terms places the

necessary restraint on the sentencer's discretion to impose death.

People v. Munson, 171 Ill. 2d 158, 191-92 (1996); People v.

Johnson, 154 Ill. 2d 356, 372-73 (1993).

     In this case, the evidence overwhelmingly supported a finding

of eligibility based on section 9--1(b)(11). The evidence showed

that the defendant coldly and meticulously planned the murder of

Dr. Sullivan. Some time prior to the crime, the defendant decided

to commit the murder of a plastic surgeon in order to "strike out"

against the perpetrators of "fake Aryan cosmetics." In furtherance

of this goal, the defendant perused the yellow pages of the

telephone book and selected Dr. Sullivan as his target, based on

the size of his advertisement. A few days prior to the crime, the

defendant called Dr. Sullivan's office and made an appointment

under a false name. At the scheduled date and time, the defendant

went to Dr. Sullivan's office for the purpose of carrying out his

plan. The defendant waited to commit the murder until he was in the

office with Dr. Sullivan so that he could be sure that he was

murdering the right man. In addition, the defendant stated that he

had planned an escape route and that he had carefully parked his

car to best effect his escape after the murder. A more coldly

planned murder is difficult to imagine. Thus, the evidence clearly

established the existence of this eligibility factor.

                 Existence of Statutory Mitigating Factor

     The defendant also contends that reversal of his death

sentence is warranted because the trial court effectively ignored

the existence of a statutory mitigating factor. The defendant

claims the evidence showed that, at the time of the murder, he was

acting under the influence of extreme mental or emotional

disturbance within the meaning of section 9--1(c)(2) of the death

penalty statute. 720 ILCS 5/9--1(c)(2) (West 1992). This contention

is not supported by the record. The only expert witness to give an

opinion at sentencing with regard to the existence of this

mitigating factor at the time of the murder was Dr. Markos. Dr.

Markos testified that, in his opinion, the defendant was not

operating under the influence of extreme mental or emotional

disturbance at the time of the murder.

     The defendant also claims that brief questioning of Dr. Markos

by the trial court, designed to ascertain if the doctor considered

the defendant to be mentally ill, demonstrates that the trial court

applied an erroneous interpretation of the statutory factor. This

conclusion is not supported. The trial court expressly stated that

it had considered the mitigating factors set forth in the death

penalty statute. We find no indication in the record that the trial

court failed to properly evaluate these factors. The questioning

referred to by the defendant constituted nothing more than the

trial court's effort to clarify a portion of Dr. Markos' testimony,

which he found confusing. We find no abuse of discretion in the

trial court's determination that this statutory mitigating factor

was not present.

                Constitutionality of Death Penalty Statute

     Finally, the defendant raises two constitutional challenges to

the Illinois death penalty statute. The defendant first contends

that the statute is unconstitutional because it places a burden of

proof on the defendant which precludes meaningful consideration of

mitigating evidence. This court has previously rejected this

argument (see People v. Edgeston, 157 Ill. 2d 201, 247 (1993)), and

we decline to reconsider that holding. The defendant also contends

that the death penalty statute is unconstitutional because it does

not sufficiently minimize the risk of arbitrarily or capriciously

imposed death sentences. We decline to reconsider our previous

holding rejecting this constitutional challenge. See People v.

Tenner, 157 Ill. 2d 341, 390 (1993).

                                CONCLUSION

     For the reasons set forth above, we affirm the defendant's

convictions for intentional murder and burglary and affirm his

death sentence. We vacate, however, the defendant's convictions for

knowing and felony murder. We hereby direct the clerk of this court

to enter an order setting Wednesday, January 15, 1997, as the date

on which the sentence of death entered by the circuit court of Cook

County shall be carried out. The defendant shall be executed in the

manner provided by law. 725 ILCS 5/119--5 (West 1994). The clerk of

this court shall send a certified copy of the mandate in this case

to the Director of Corrections, the warden of Stateville

Correctional Center, and the warden of the institution where the

defendant is now confined.

Convictions affirmed in part

                                                     and vacated in part;

                                                      sentences affirmed.

                                                                         

     JUSTICE FREEMAN, concurring in part and dissenting in part:

     Although I concur in the majority's affirmance of the

defendant's burglary and intentional murder convictions in this

case, I disagree with its conclusions concerning the propriety of

the death sentence hearing. Specifically, I am deeply troubled by

the majority's treatment of the trial judge's summary finding that

defendant was eligible for the death penalty. The trial judge here

not only failed to follow the procedure established by the

legislature in conducting the hearing, but also misstated the law

to a pro se defendant. These errors, taken together, cast serious

doubt on the integrity of the proceeding which we review today.

Therefore, I must respectfully dissent from that portion of the

opinion.

                                     I

     Our death penalty statute expressly provides that upon the

State's request, the court "shall conduct a separate sentencing

proceeding to determine the existence of factors set forth in

subsection (b) [eligibility factors] and to consider any

aggravating or mitigating factors as indicated in subsection (c).

The proceeding shall be conducted *** before the court alone if the

defendant waives a jury for the separate proceeding." 720 ILCS 5/9-

-1(d)(3) (West 1992). During the hearing, "any information relevant

to any of the [eligibility] factors *** may be presented by either

the State or the defendant under the rules governing the admission

of evidence at criminal trials. *** The State and the defendant

shall be given fair opportunity to rebut any information received

at the hearing." 720 ILCS 5/9--1(e) (West 1992). Finally, the

statute further provides that the burden of proof for establishing

the existence of the eligibility factors is on the State and "shall

not be satisfied unless established beyond a reasonable doubt." 720

ILCS 5/9--1(f) (West 1992).

     The transcript of proceedings in this case reveals that the

trial judge did not follow these procedures. I quote from the

record at length in order to relate in full the extent to which the

judge deviated from the statute. As demonstrated by the portion of

the transcript quoted below, the eligibility hearing took place

immediately after the trial court found defendant guilty as charged

in the indictment.

               "[THE COURT]: There's really nothing that the court

          can add to what has already been added by virtue of the

          totality of the evidence in this case and so, therefore,

          it now becomes my obligation and responsibility to tell

          Mr. Jonathan Haynes that he is guilty in the manner and

          form as charged in the indictment. That is the finding of

          the court, and judgment will be entered on the finding.

               Please step up, Mr. Haynes. Mr. Haynes, under the

          charge that has been placed against you, this is felony

          murder. A felony murder carries with it a possible

          sentence of death. And since the court has found you

          guilty in manner and form as charged in the indictment,

          and since one of the allegations in the indictment was

          that you committed this first degree murder in the course

          of the perpetration of another felony, that being

          burglary, that makes you eligible to have death imposed

          upon you as a sentence in this case.

               The law states that under these circumstances, a

          Defendant having been found guilty under the felony

          murder count of the indictment has a right to have the

          determination made as to whether or not death should be

          imposed by a fact finder, either a jury or by the court.

          And I now ask you at this time, do you understand what I

          have just stated?

               MR. HAYNES: Yes, I do.

               THE COURT: Do you wish to confer again with [stand-

          by counsel] with reference to your rights now as to

          whether you wish to have a jury hear and make a

          determination as to what the sentence should be in this

          case or whether you wish the court to make that

          determination? Do you wish to--confer with [stand-by]

          counsel on that issue?

               MR. HAYNES: No, I do not.

               THE COURT: What is your desire? Do you wish a jury

          to hear and make a determination as to the sentence to

          impose upon you after you have been found guilty of first

          degree felony murder or do you wish to [sic] court to

          make that determination?

               MR. HAYNES: I will let the court decide.

               THE COURT: I will ask you at this time, therefore,

          to sign the jury waiver which states that you waive your

          constitutional right to have a jury determine what your

          punishment should be in this case, and are willing to

          submit this issue to a court sitting without a jury.

                                   * * *

               Mr. Haynes, I'm passing to you a document which if

          you sign it means that your will waive your

          constitutional right to have a jury hear evidence and

          determine what the sentence should be in this case after

          a finding of guilty. I want you to be absolutely clear

          that you understand what you are signing when you sign

          this document. Do you understand that?

               MR. HAYNES: Yes. Yes, I do."

At this point in the proceedings, stand-by counsel requested to

have defendant ordered examined for a determination of his fitness

to be sentenced. The court denied the request. The following

colloquy then occurred:

               "MR. PAYNTER [Assistant State's Attorney]: Your

          Honor, the People at this time would just merely wish to

          supplement the action the court has taken by filing with

          the court A MOTION TO CONDUCT A SENTENCE PROCEEDING TO

          DETERMINE THE IMPOSITION OF THE DEATH PENALTY.

               THE COURT: Proceed.

               MR. PAYNTER: We are prepared to proceed on the

          eligibility.

               THE COURT: No, I find him eligible. SO WE DON'T HAVE

          TO HAVE ANY EVIDENCE PRESENTED ON THAT ISSUE. I FIND THAT

          THE LAW IS SUCH THAT HE IS CHARGED WITH FELONY MURDER. HE

          HAS BEEN FOUND GUILTY OF FELONY MURDER.

               With felony murder, one of the sentences that is

          possible for a felony murder is the death penalty. So I

          find him based upon the evidence that has been presented

          in the trial, that he is eligible to have the death

          penalty imposed upon him.

               MR. PAYNTER: The court also takes judicial notice

          the Defendant is over the age of 18.

               THE COURT: Yes." (Emphasis added.)

The court then continued the proceeding to the following week,

stating that "[t]here's been a finding of eligibility for the

imposition of the death penalty."

     At the beginning of the next court session, the trial judge

stated to defendant that "this is the sentence hearing. The State

is asking that you be sentenced to death, and under the statute,

there is a sentencing hearing required because the Court has found

that your are eligible to have the death penalty imposed. Do you

still desire and wish to represent yourself in this sentencing

hearing?" Defendant responded affirmatively. The following exchange

between the assistant State's Attorney and the trial judge then

occurred:

               "MR. NELSON: Judge, we addressed the eligibility

          question on Friday.

               We'd ask you to inquire of the defendant if there

          was any evidence he wished to offer on that particular

          issue.

               THE COURT: No. DOESN'T NEED TO BE. I FOUND AS A

          MATTER OF LAW THAT HE IS ELIGIBLE. SO, WHATEVER HE SAYS

          IS NOT GOING TO HAVE ANY CONSEQUENCE BECAUSE THE LAW SAYS

          HE'S ELIGIBLE." (Emphasis added.)

                                    II

     The majority concludes that the "trial court did, as the

defendant here claims, dispense with a hearing on eligibility and

make a summary finding of eligibility. This conduct by the trial

court was clearly in violation of our death penalty statute." Slip

op. at 32. The majority, however, goes on to hold that "at no time

*** did the defendant demand a hearing on eligibility, request that

he be permitted to present evidence on the issue, or otherwise

object to the trial court's handling of the issue *** and thereby

waived this claim of error for review." Slip op. at 32. I find this

resolution of defendant's contentions, on the basis of waiver,

disconcerting on two levels.

     Initially, I cannot fathom how a pro se defendant, having just

been found guilty of murder, can be expected to perceive and

appreciate the ramifications of the trial judge's errors with

regard to sentencing procedure when, with all respect, the learned

trial judge did not. Even if defendant had, the record indicates

that the judge would not have been receptive to a challenge. As

revealed in the transcript quoted above, the trial judge refused

even the prosecutor's attempts to tailor the hearing to conform

with the requirements of the statute. There is no reason to believe

that this pro se defendant's exhortations would have fared any

better. Although I generally agree that a pro se defendant must be

held to the same standards as an attorney, the United States

Supreme Court has recognized that the judge before whom a defendant

appears without counsel has a duty "to take all steps necessary to

insure the fullest protection" of the constitutional right to a

fair trial "at every stage of the proceedings." Von Moltke v.

Gillies, 332 U.S. 708, 722, 92 L. Ed. 309, 320, 68 S. Ct. 316, 322

(1948). This protection extends both to the right to counsel and to

all "essential rights of the accused." Glasser v. United States,

315 U.S. 60, 71, 86 L. Ed. 680, 699, 62 S. Ct. 457, 465 (1942). The

transcript in this case demonstrates that the trial judge was less

than meticulous in safeguarding defendant's rights at sentencing.

     Under my reading of our death penalty statute, a defendant is

not under any obligation to "demand" a hearing on eligibility. The

statute mandates that the trial court "shall" conduct such a

hearing upon the State's request. See 720 ILCS 5/9--1(d) (West

1992). The transcript amply illustrates that any objection or

request for permission to adduce evidence regarding eligibility on

defendant's part would have been futile: The prosecutor, sensing

the gravity of the judge's actions, specifically requested the

judge to inquire of defendant if there was any evidence he wished

to offer as to eligibility. The trial judge refused, stating that

there "[d]oesn't need to be" because he had already "found that as

a matter of law that [defendant was] eligible." The statute,

however, expressly provides that a defendant may present any

information relevant to factors regarding eligibility. See 720 ILCS

5/9--1(e) (West 1992). Thus, the majority's stated reasons for

finding waiver ring hollow when juxtaposed against what was

actually said and done at the hearing.

     It is with these concerns in mind, perhaps, that the majority

ultimately concludes that defendant "has not demonstrated that he

was prejudiced by the trial court's actions." Slip op. at 33. The

reason the majority gives for this conclusion is that the evidence

of defendant's eligibility was "overwhelming." Slip op. at 33. That

may be so, but the harm caused by the trial judge's error affected

more than mere eligibility. Contrary to the majority's position, I

believe that the trial court's determination of defendant's death

eligibility, made before the State even filed its motion for a

death sentencing hearing, resulted in two distinct problems which

mandate reversal.

     First, the trial judge preempted the State from going forth

with its case of death eligibility. Indeed, when the prosecutor

attempted to adduce its evidence of eligibility, the trial judge

replied, erroneously, that we "don't have to have any evidence

presented on that issue. He has been found guilty of felony

murder." Not only does this statement presuppose that the State

wished to proceed on a felony-murder theory of death eligibility,

but it evinces the trial judge's disregard of defendant's statutory

right both to put on evidence and to rebut the information adduced

by the State at the eligibility phase of the hearing. In upholding

the constitutionality of our death penalty statute, the Seventh

Circuit Court of Appeals noted that the statute's "series of

procedural safeguards ensure that the defendant is given a

meaningful opportunity to respond to the State's request for the

imposition of the death penalty." Silagy v. Peters, 905 F.2d 986,

997 (7th Cir. 1990). As a result, that court determined that the

sentencing hearing mandated by our statute provides for all the

procedure which is due under the fourteenth amendment. Silagy v.

Peters, 905 F.2d at 998. Thus, when a trial judge dispenses with

the eligibility hearing, one of the series' procedural safeguards

of due process is lost.

     More important, the trial judge's statement demonstrates a

disregard of the fact that not all defendants found guilty of

felony murder at trial are ipso facto death eligible at sentencing.

A capital sentencing scheme must provide a " `meaningful basis for

distinguishing the few cases in which [the penalty] is imposed from

the many cases in which it is not.' " Gregg v. Georgia, 428 U.S.

153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976),

quoting Furman v. Georgia, 408 U.S. 238, 313, 33 L. Ed. 2d 346,

392, 92 S. Ct. 2726, 2764 (1972) (White, J., concurring). The

United States Supreme Court has recognized that the eligibility

phase of a death sentence hearing plays a "constitutionally

necessary" function by "circumscrib[ing] the class of persons

eligible for the death penalty." Zant v. Stephens, 462 U.S. 862,

877-78, 77 L. Ed. 2d 235, 251, 103 S. Ct. 2733, 2743 (1983). This

phase of the hearing safeguards against arbitrary and capricious

sentencing because it reasonably justifies the narrowing of the

class of persons convicted of murder who are eligible for the death

penalty. Zant, 462 U.S. at 874-77, 77 L. Ed. 2d at 248-49, 103 S.

Ct. at 2741-42. In the past, this court, too, has echoed these same

concerns by noting that "[a]ggravating factors serve as necessary

prerequisites without which the death sentence cannot be imposed;

they delineate the borderline between those cases in which death is

a possible punishment and those in which it cannot be considered."

People v. Lewis, 88 Ill. 2d 129, 145 (1981); see also People v.

Ramey, 151 Ill. 2d 498, 544 (1992); People v. Simms, 143 Ill. 2d

154, 170 (1991). Thus, the trial judge's error unnecessarily

compromised the constitutionality of the hearing conducted in this

case.

                                    III

     Despite the trial judge's failure to adhere to the statute's

procedural requirements and his numerous misstatements of the law

throughout these proceedings, the majority holds that the trial

court's admonishments to the defendant "were sufficient to

effectuate a valid sentencing jury waiver." Slip op. at 36. I

strongly disagree.

     After the trial judge had found, sua sponte, defendant

eligible for the death penalty, he undertook to ascertain if the

defendant wished to waive a jury for his hearing. As noted, our

death penalty statute grants defendants the right to choose a jury

for their death sentencing hearing even when they are convicted at

a bench trial. See 720 ILCS 5/9--1(d) (West 1992). The statute thus

contemplates a hearing in which a jury will consider defendant's

eligibility for the death penalty in addition to whether the death

penalty should be imposed. Thus, defendant possesses a liberty

interest, protected by the due process clause of the fourteenth

amendment, to have, if he so desires, a jury decide all of the

issues relevant to sentencing. See People v. Mack, 167 Ill. 2d 525,

534 (1995). Here, however, the trial judge effectively denied

defendant his right to elect to have a jury determine eligibility.

Therefore, I cannot join in the majority's terse conclusion that

the "record reveals that the defendant clearly waived a jury for

the ENTIRE sentencing determination." (Emphasis added.) Slip op. at

36. Although defendant may have knowingly given up his right to

have a jury elect his fate IN THE MANNER ERRONEOUSLY DESCRIBED TO

HIM BY THE TRIAL JUDGE, it cannot be said that he knowingly waived

a statutory right which, unbeknownst to him, had already been

denied.

                                    IV

     Accordingly, I cannot agree with my colleagues that because

there is evidence in the record to support a finding of

eligibility, defendant suffered no prejudice from the trial judge's

actions. In the past, this court has required "a high standard of

procedural accuracy" in death sentencing hearings in order to

ensure that "THE PENALTY IS APPLIED IN AS UNIFORM A MANNER AS

POSSIBLE WITHIN THE FRAMEWORK OF AN ADVERSARY PROCEEDING."

(Emphasis added.) People v. Walker, 91 Ill. 2d 502, 517 (1982). In

fact, this court recently, in a unanimous decision, reversed a

sentence of death imposed by the same trial judge for actions

similar, in part, to those reviewed here today. See People v.

Brown, 169 Ill. 2d 132, 163 (1996) (finding error where trial judge

immediately proceeded to determine death eligibility after finding

defendant guilty of murder). Given the similarity of the

complained-of actions in the case at bar, I see no reason for

today's departure from such recent precedent.

     Where, as here, the trial judge takes it upon himself to

declare a defendant death eligible immediately after finding that

defendant guilty and prior to the State's formal request for a

death sentencing hearing, the resultant "hearing" loses the

appearance of an adversarial proceeding. The manner in which the

trial judge rushed to make the eligibility judgment was not only

statutorily infirm, but unseemly. His statements regarding the

felony-murder eligibility factor reflect an erroneous belief that

all defendants convicted of felony murder are eligible for death as

a matter of law and no evidence need be heard on the issue. Such a

viewpoint certainly does not inspire confidence in the judge's

ability to hear the issue impartially. Although the majority

"emphasize[s]" that it "do[es] not condone" the procedure employed

by the trial judge (slip op. at 34), its ultimate affirmance of the

death sentence, in my mind, provides little, if any, incentive

against its future commission. As the cases analyzing the

constitutionality of our death penalty clearly demonstrate, the

procedure established by the General Assembly for conducting a

death sentencing hearing is not a mere suggestion to be complied

with on an ad hoc basis. In matters of life and death, it is this

court's constitutional, if not moral, obligation to do more than

"not condone" the improper actions of the trial judge in this case.

We must not hesitate to reverse those actions lest bench and bar

assume that the laxity at issue here is, in any way, tolerable or

excusable. It simply is not. Therefore, I would vacate defendant's

death sentence and remand the matter for a new sentencing hearing

which comports with the procedural requirements of the statute.

     JUSTICES MILLER and McMORROW join in this partial concurrence

and partial dissent.